**AMOCO OIL COMPANY et al., Petitioners**

**v.**

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**No. 74–2131.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1975.

Decided July 6, 1976.

As Amended July 15, 1976.

James F. Davis, Washington, D.C., with whom William Simon, Washington, D.C., was on the brief, for petitioners.

Edward J. Shawaker, Atty., Dept. of Justice, and Leslie A. Carothers, Atty., E.P.A.,

Washington, D.C., with whom Wallace H. Johnson, Asst. Atty. Gen., Robert V. Zener, Gen. Counsel, E.P.A., Edmund B. Clark and Raymond N. Zagone, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondent.

Before WRIGHT, MacKINNON and ROBB, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

Dissenting opinion filed by Circuit Judge J. SKELLY WRIGHT.

MacKINNON, Circuit Judge:

We here review for the second time regulations promulgated by the Administrator of the Environmental Protection Agency (EPA) for the protection of catalytic converter emission control devices pursuant to section 211(c)(1)(B) of the Clean Air Act of 1970, which provides:

(c)(1) The Administrator may, from time to time on the basis of information obtained under subsection (b) of this section or other information available to him, by regulation, control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine . . .
(B) if emission products of such fuel or fuel additive will impair to a significant degree the performance of any emission control device or system which is in general use, or which the Administrator finds has been developed to a point where in a reasonable time it would be in general use were such regulation to be promulgated.

42 U.S.C. § 1857f–6c(c)(1)(B) (1970). Because lead emissions interfere with the operation of the catalytic converters now installed on most new cars,[1] the Administrator on January 10, 1973 issued regulations requiring the sale of unleaded gasoline for the protection of those devices.[2] Those reg-

---

1. *See Amoco Oil Co. v. EPA,* 163 U.S.App.D.C. 162, 166 & n.3, 501 F.2d 722, 726 & n.3 (1974).

2. 38 Fed.Reg. 1254–56 (Jan. 10, 1973). The proposed regulations had been published on February 23, 1972, 37 Fed.Reg. 3882–84, at

ulations were challenged by 16 branded refiners, including the 11 petitioners here, and in *Amoco Oil v. EPA*[3] (hereafter *Amoco I*) were upheld in all but one respect by this court on May 1, 1974. The *Amoco I* court invalidated the liability sections of the first regulations which imposed liability upon a *refiner* for sales of contaminated (leaded) gasoline as unleaded by a *retailer* irrespective of the actual fault of the refiner.[4] In reaching such conclusion we found that the EPA had improperly incorporated into the liability sections an irrebuttable presumption of refiner fault: even if the refiner could prove that the contamination resulted from an unforeseeable act of vandalism by a third party or from an unpreventable breach of contract by a distributor or a jobber, he would still be held liable.[5]

Following the decision in *Amoco I,* the Administrator redrafted the liability section of the regulations and reissued it.[6] It is this section which is the subject of this appeal.[7]

which time comments were solicited from the public. Hearings were thereafter held in three cities. The final regulations appear in 40 C.F.R. part 80 (1975).

The regulations at issue here must be distinguished from those which the EPA has issued under section 211(c)(1)(A) of the Clean Air Act, 42 U.S.C. § 1857f–6c(c)(1)(A) (1970), to protect the public health. 38 Fed.Reg. 33741 (Dec. 6, 1973). The latter regulations, which limit the lead content of all gasoline, have elsewhere been upheld by this court in a divided vote. *Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 541 F.2d 1 (1976).

3. 163 U.S.App.D.C. 162, 501 F.2d 722 (1974). The regulations which were then under review are set out as an addendum to that opinion. *Id.* at 193–97, 501 F.2d at 753–57.

4. 40 C.F.R. §§ 80.23(a)(1), (a)(2) (1973).

5. 163 U.S.App.D.C. at 188, 501 F.2d at 748.

6. 39 Fed.Reg. 42360 (Dec. 5, 1974); 39 Fed.Reg. 43284 (Dec. 12, 1974). The new regulation appears in 40 C.F.R. § 80.23 (1975). The revised liability section was first proposed a month before our decision in *Amoco I, see* 39 Fed.Reg. 13174 (April 11, 1974), because the "EPA has concluded that certain of petitioners' objections [in *Amoco I*] are valid and should be recognized in the provision for apportionment of liability." *Id.* The *Amoco I* court took note of the proposed revisions, but observed that they were "not before us in this litigation." 163 U.S.App.D.C. at 189 n.3, 501 F.2d at 749 n.3.

7. § 80.23 Liability for violations.
Liability for violations of paragraph (a) of § 80.22 shall be determined as follows:
(a)(1) Where the corporate, trade, or brand name of a gasoline refiner or any of its marketing subsidiaries appears on the pump stand or is displayed at the retail outlet or wholesale purchaser-consumer facility from which the gasoline was sold, dispensed, or offered for sale, the retailer or wholesale purchaser-consumer, the reseller (if any), and such gasoline refiner shall be deemed in violation. Except as provided in paragraph (b)(2) of this section, the refiner shall be deemed in violation irrespective of whether any other refiner, distributor, retailer, or wholesale purchaser-consumer or the employee or agent of any refiner, distributor, retailer, or wholesale purchaser-consumer may have caused or permitted the violation.
(2) Where the corporate, trade, or brand name of a gasoline refiner or any of its marketing subsidiaries does not appear on the pump stand and is not displayed at the retail outlet or wholesale purchaser-consumer facility from which the gasoline was sold, dispensed, or offered for sale, the retailer or wholesale purchaser-consumer and any distributor who sold that person gasoline contained in the storage tank which supplied that pump at the time of the violation shall be deemed in violation.
(b)(1) In any case in which a retailer or wholesale purchaser-consumer and any gasoline refiner or distributor would be in violation under paragraphs (a)(1) or (2) of this section, the retailer or wholesale purchaser-consumer shall not be liable if he can demonstrate that the violation was not caused by him or his employee or agent.
(2) In any case in which a retailer or wholesale purchaser-consumer, a reseller (if any), and any gasoline refiner would be in violation under paragraph (a)(1) of this section, the refiner shall not be deemed in violation if he can demonstrate:
(i) That the violation was not caused by him or his employee or agent; and
(ii) That the violation was caused by an act in violation of law (other than the Act or this part), or an act of sabotage, vandalism, or deliberate commingling of leaded and unleaded gasoline, whether or not such acts are violations of law in the jurisdiction where the violation of the requirements of this part occurred, or
(iii) That the violation was caused by the action of a reseller or a retailer supplied by such reseller, in violation of a contractual undertaking imposed by the refiner on such reseller designed to prevent such action, and

The petitioners originally made two arguments against the new liability section; but on appeal following oral argument, at our suggestion, the parties met and agreed upon a modification of the regulations which has mooted one of those arguments.[8]

The remaining issue in the case, characterized as the "retail dealer" issue by the parties, requires this court again to consider the extent to which a refiner may be held liable for the actions of retail dealers who sell its products.

despite reasonable efforts by the refiner (such as periodic sampling) to insure compliance with such contractual obligation, or

(iv) That the violation was caused by the action of a retailer who is supplied directly by the refiner (and not by a reseller), and whose assets or facilities are not substantially owned, leased, or controlled by the refiner, in violation of a contractual undertaking imposed by the refiner on such retailer designed to prevent such action, and despite reasonable efforts by the refiner (such as periodic sampling) to insure compliance with such contractual obligation, or

(v) That the violation was caused by the action of a distributor subject to a contract with the refiner for transportation of gasoline from a terminal to a distributor, retailer or wholesale purchaser-consumer, in violation of a contractual undertaking imposed by the refiner on such distributor designed to prevent such action, and despite reasonable efforts by the refiner (such as periodic sampling) to insure compliance with such contractual obligation, or

(vi) That the violation was caused by a distributor (such as a common carrier) not subject to a contract with the refiner but engaged by him for transportation of gasoline from a terminal to a distributor, retailer or wholesale purchaser-consumer, despite reasonable efforts by the refiner (such as specification or inspection of equipment) to prevent such action, or

(vii) That the violation occurred at a wholesale purchaser-consumer facility: *Provided, however,* That if such wholesale purchaser-consumer was supplied by a reseller, the refiner must demonstrate that the violation could not have been prevented by such reseller's compliance with a contractual undertaking imposed by the refiner on such reseller as provided in paragraph (b)(2)(iii) of this section.

(c) In any case in which a retailer or wholesale purchaser-consumer, a reseller, and any gasoline refiner would be in violation under paragraph (a)(1) of § 80.23, the reseller shall not be deemed in violation if he can demonstrate that the violation was not caused by him or his employee or agent.

(d) In any case in which a retailer or wholesale purchaser-consumer and any gasoline distributor would be in violation under paragraph (a)(2) of this section, the distributor will not be deemed in violation if he can

demonstrate that the violation was not caused by him or his employee or agent.

(e)(1) In any case in which a retailer or his employee or agent or a wholesale purchaser-consumer or his employee or agent introduced leaded gasoline from a pump from which leaded gasoline is sold, dispensed, or offered for sale, into a motor vehicle which is equipped with a gasoline tank filler inlet designed for the introduction of unleaded gasoline, only the retailer or wholesale purchaser-consumer shall be deemed in violation.

(2) If a retailer or a wholesale purchaser-consumer establishes that the conduct referred to in paragraph (e)(1) of this section was in response to the requirements of a *bona fide* emergency (such as when the gasoline tank of a vehicle is almost empty and no unleaded gasoline is available within a several mile radius), the retailer or wholesale purchaser-consumer will not be deemed in violation: *Provided, however,* That the amount of leaded gasoline which was introduced into the vehicle was limited to no more than was reasonably required to alleviate the circumstances of the particular emergency situation.

8. Petitioners objected to provisions in the new regulations which required a refiner, in order to avoid strict liability, to prove affirmatively that the violation "was caused" by another party. *See* 40 C.F.R. § 80.23(b) (2) (ii)—(vii), *supra* note 7. Because the Clean Air Act provides that "violators" are to be held liable, 42 U.S.C. § 1857f–6c(d) (1970), it was argued that the statute does not allow the Administrator to impose absolute liability on one who fails to prove that he is not a "non-violator." Therefore, petitioners maintained that the regulations should be revised to make it clear that the burden of proof lies with the Administrator.

At the suggestion of this court, the parties met following oral argument and drafted the following additional subsection which they agree disposes of the "burden of proof" issue in a manner satisfactory to both sides:

(viii) In subparagraphs (ii) through (vi) hereof, the term "was caused" means that the refiner must demonstrate by reasonably specific showings by direct or circumstantial evidence that the violation was caused or must have been caused by another.

The new subsection will appear in 40 C.F.R. § 80.23(b)(2)(viii).

■ The "retailer dealer" issue centers around subsection (b)(2)(iv) of the new regulation, 40 C.F.R. § 80.23(b)(2)(iv) (1975), which allows the refiner to escape the general liability imposed by section 80.23(a) for the acts of directly-supplied retail distributors of its products if it can demonstrate that the violation in question was not caused by it or its employee or agent, *and*:

(iv) That the violation was caused by the action of a retailer who is supplied directly by the refiner (and not by a reseller), *and whose assets or facilities are not substantially owned, leased, or controlled by the refiner,* in violation of a contractual undertaking imposed by the refiner on such retailer designed to prevent such action, and despite reasonable efforts by the refiner (such as periodic sampling) to insure compliance with such contractual obligation . . . .

(Emphasis added). *See* note 7 *supra.* The provision to which petitioners object is the phrase which allows the refiner to escape liability *only* if it can show that the guilty retailer is one "whose assets or facilities are not substantially owned, leased, or controlled by the refiner." Under this provision, the refiner would *always* be liable for the actions of a retailer who leases his station from a refiner, unless one of the special exceptions in the regulations applied.[9] The petitioners object to this blanket imposition of liability as mandated by subsection (b)(2)(iv). We agree that this language goes too far in imposing liability without proof of fault and that it should be stricken from the regulation.

Initially, it should be made clear that we are concerned here only with the liability for *negligent* contamination, since the refiner is able to escape liability for deliberate acts of contamination on the part of the retailer under the provisions of 40 C.F.R. §§ 80.23(b)(2)(ii) or 80.23(e) (1975).[10] The only means under the regulation by which the refiner can avoid liability for the negligent or inadvertent acts of his directly-supplied retailers, however, is to prove under 40 C.F.R. §§ 80.23(b)(2)(i) and (iv) that *all* of the following are true:

(1) that the violation was not caused by an employee or agent; and
(2) that the violation was caused by the action of an independent (non-lessee) retailer; and
(3) that the retailer's action was in violation of a contractual undertaking imposed by the refiner upon the retailer and designed to prevent such action; and
(4) that the refiner had made reasonable efforts to insure compliance with that contractual obligation.

Our objection to this new regulation is that, even assuming the fault of the lessee can be proved, we do not believe that the lessee's negligence can be imputed to the refiner in all cases. The second element which must be proved under section (b)(2) in order for the refiner to escape liability is that the violation was caused by an independent (non-lessee) retailer. Thus, if condition (2) is not met because the retailer's facilities are leased to him by the refiner, the escape provisions of subsection (b)(2)(iv) can *never* apply even if the refiner has imposed upon the retailer a strict contractual undertaking to avoid contamination and made every human effort possible to insure compliance with it. Such result is arbitrary.

In defense of the capricious results[11] dictated by this EPA rule, the dissent observes that "this, in itself, is no ground for striking

9. *See* 40 C.F.R. §§ 80.23(b)(2)(ii), 80.23(e) (1975), *supra* note 7.

10. The dissent argues that "the lessee has precious few opportunities to cause non-deliberate —negligent—contamination. The refiner both controls deliveries of gasoline to the station by tank truck . . . and maintains substantial control over the equipment that will handle the gasoline at the station. . . ." Dissent 177 U.S.App.D.C. at ——, 543 F.2d at 280. This, of course, assumes the very point at issue here:

who actually controls the retailer's facilities? The fact that the refiner initially installed the equipment is certainly not dispositive, and whether the refiner "remains the owner of it, charged with its continuing care" will depend upon the terms of the individual lease agreement.

11. Under the Administrative Procedure Act, 5 U.S.C. § 706(2) (1970), we are to "hold unlawful and set aside agency actions . . . found to be (A) arbitrary, capricious, an abuse

down the regulation. Employers—to use the most common example of vicarious liability—are held responsible every day for torts of employees even where they have taken all possible steps to avoid the injury." Dissent 177 U.S.App.D.C. at —— – ——, 543 F.2d at 270–280. It is argued that the EPA is entitled to impute liability to refiners generally on the ground that "vicarious liability is imposed . . . because some *properly authorized* agency of government—court, legislature, or administrative body—has determined that such an allocation of responsibility will serve society's ends," dissent 177 U.S.App.D.C. at ——, 543 F.2d at 281 (emphasis added), and that the "EPA is, beyond doubt, the *properly authorized* body to choose the liability standards that will best achieve the purposes of the Clean Air Act." Dissent 177 U.S.App.D.C. at —— – ——, 543 F.2d at 282 (emphasis added). But where is the authority in the relevant statute to alter the settled law which establishes the legal responsibility of the instant parties? It is true, of course, that vicarious liability is often imposed despite the fact that the party to whom negligence is imputed has taken all possible steps to avoid the injury or harm. But that generalization does not justify the EPA's action here, since the Administrator's rule goes well beyond the bounds of traditional vicarious liability.

██ As a starting point, it should be noted that the EPA is not "properly authorized" to impose a blanket vicarious liability. There is nothing in the statutory grant of power to the Administrator "by regulation [to] control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine . . . ," 42 U.S.C. § 1857f–6c(c)(1), that expressly or impliedly authorizes him to alter the settled law between lessor and lessee as to their respective responsibilities in tort [12] so as to make the refiner liable for *independent* lessees as though they were mere subservient employees. The single fact that a refiner may have leased certain real estate and appurtenances to an individual who sells his products does not, without more, furnish any logical or legal basis for imposing blanket responsibility upon the owner for offenses or tortious acts committed by the lessee on the premises. In the absence of any indication of a specific intent on the part of Congress to create a "new tort," [13] the traditional common law rules of vicarious liability must apply. *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952). The authority given to the EPA by Congress did not vest the EPA with power to supplant those rules with the doctrine of strict liability. There is a well defined body of law which determines when negligence may be imputed from one party to another and it is therefore to this law that we must look to judge

---

of discretion, or otherwise not in accordance with law." That standard justifies the disposition we make of this case.

**12.** Generally, the landlord is not responsible for injuries or harm caused by conditions which develop or are created by the tenant after possession (and thus control over the premises) has been transferred; nor is the landlord responsible for activities which the tenant carries on upon the land after the transfer. W. Prosser, Law of Torts § 63 (4th ed. 1971). *See also* 2 Restatement (Second) of Torts §§ 355–56 (1965). Control over the premises is often a decisive factor. 2 Restatement, *supra*, at § 360; Steffen, *Independent Contractor and the Good Life*, 2 U.Chi.L.Rev. 501, 520 (1935).

**13.** Our dissenting colleague speaks of a "new tort" but what he really attempts to bring about is a new liability for an old tort, *i. e.*, negligent contamination. There is nothing new about that tort. It is as old as merchandising—and from time to time it appears in new forms. That the dissenting opinion would radically and lightly change long established law is implicitly admitted 177 U.S.App.D.C. at —— – ——, 543 F.2d at 281–282, *infra*. The change is massive and legislative in character and if Congress wants to impose such liability without fault it can be authorized in a proper way; but Congress has not done so in the existing act. How imposing liability for another's tort on one who is without fault may operate to serve "society's ends," dissent 177 U.S.App.D.C. at ——, 543 F.2d at 281, is not explained. Actually, the real objective is to strengthen the arbitrary hand of the agency and ease its burden of collecting its penalties.

the legality of the EPA's new liability regulations.

▮ Generally, vicarious liability may be imposed upon a non-negligent person by reason of some closely integrated relationship existing between him and the negligent party.[14] The essence of such relationship is that the person to whom the negligence is imputed has sufficient control over the *acts* of the negligent party to justify the conclusion that he is responsible for what happened.[15] The facts and circumstances of each case must be examined individually to determine whether the relationship in question exhibits the necessary degree of control to justify the imputation of negligence from one party to the other. For example, the court must decide in employment situations whether the negligent party was an employee, whose negligence may be imputed to his employer, or an independent contractor, for whose actions no liability will attach to the employer.[16] Similarly, the details of an agency relationship must be examined before negligence will be imputed to the principal.[17]

▮ The case now before us presents a question of whether vicarious liability can be imposed on a lessor for the negligent acts of his lessee who sells the lessor's products. Traditionally, the rule has been that once control of the premises passes to the lessee, the landlord is not vicariously liable for accidents which occur thereon unless he has retained control over the premises.[18] Ignoring this ancient rule, the EPA here seeks to hold lessor-refiners liable regardless of the true nature of their relationship with their retailers. In the complex and difficult situation now before us, we are not prepared to raise the general rule as a complete bar to refiner liability; on the other hand, we do feel it means that vicarious liability cannot be imposed on *all* refiners for *any and all* negligent contaminations which occur *regardless* of the circumstances and the degree of control exerted by the refiner over the retailer-lessee. The mere fact that a retailer sells a refiner's products and leases his facilities from the refiner are not by themselves such compelling evidence of control by the refiner as to justify conclusive imputation to the refiner of the retailer's negligence. Oil company lease agreements are not required to follow a prescribed pattern. No doubt some lease agreements may contain such strong evidence of control by the refiner as to justify the imposition of vicarious liability; but it is equally possible that the lease may affirm and protect the independence of the retailer.[19] In the absence of some demonstrated link between a lease agreement and a degree of actual control over gasoline retail-

---

14. *See* W. Prosser, *supra* note 12, at 458.

15. *See* Douglas, *Vicarious Liability and Assumption of Risk*, 38 Yale L.J. 584, 594 (1929); Harper, *The Basis of the Immunity of an Employer of an Independent Contractor*, 10 Ind. L.J. 494 (1935); Morris, *The Torts of an Independent Contractor*, 29 Ill.L.Rev. 339, 343 (1935); Steffen, *Independent Contractor and the Good Life*, 2 U.Chi.L.Rev. 501 (1935).

16. *See generally* W. Prosser, *supra* note 12, at §§ 70–71.

17. *See* W. Prosser, *supra* note 12, at 467; W. Seavey, Law of Agency, 138, 142 (1964).

18. *See* note 12 *supra*.

19. *See, e. g., Simpson v. Union Oil Co. of California*, 377 U.S. 13, 20, 84 S.Ct. 1051, 1056, 12 L.Ed.2d 98 (1964); *FTC v. Sinclair Refining Co.*, 261 U.S. 463, 473–75, 43 S.Ct. 450, 453–54, 67 L.Ed. 746 (1923); *Gray v. Shell Oil Co.*, 469 F.2d 742 (9th Cir. 1972); *Site Oil Co. of Mo. v.*

*NLRB*, 319 F.2d 86 (8th Cir. 1963); *Peter v. Union Oil Co. of California*, 328 F.Supp. 998 (N.D.Cal.1971); *United States v. Richfield Oil Co.*, 99 F.Supp. 280, 288–89 (S.D.Cal.), *aff'd*, 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1334 (1951).

The dissent criticizes our use of these antitrust cases as saying "nothing whatever about imposition of vicarious liability." Dissent 177 U.S.App.D.C. at ——, 543 F.2d at 283 (footnote eliminated). But we cite them only for the proposition that some, if not many, retail dealers "have all or most of the indicia of entrepreneurs." *Simpson, supra*, 377 U.S. at 20, 84 S.Ct. at 1056. The Supreme Court in these cases examined individual refiner-lessee relationships and found that the lessee was an independent businessman. This, although certainly not dispositive of the issue in the present case, does cast doubt upon the EPA's finding that *all* lessees are mere appendages of the refiner.

ers sufficient to justify imputing their negligence to the refiner-lessor, we conclude that the EPA cannot by regulation impose blanket liability upon refiners for all of the negligent acts of their lessees in the sale of gasoline in violation of the applicable statute and regulations.

The dissenting opinion attempts to characterize our position on this point as requiring a "high degree" of control by the refiner over his lessee before negligence may be imputed. Dissent 177 U.S.App.D.C. at ——, 543 F.2d at 280. That is an incorrect interpretation of our holding. We are not now attempting to define the nature of the relationship which will justify the imposition of vicarious liability.[20] Rather, all we are saying is that the EPA must examine the indicia of control in each refiner-lessee relationship and find it to be sufficient to hold the refiner liable for the negligence of the lessee before the negligence may be imputed to the refiner. In promulgating the regulation under review here, it is true that the EPA found that refiners have "sufficient control of facilities owned or leased by them to prevent contamination of unleaded gasoline. . . ."[21] But

---

**20.** In using the term "closely integrated" to characterize the relationship which must be shown to exist between the employer and his "employee," text 177 U.S.App.D.C. at ——, 543 F.2d at 276 *supra*, we only signify that their relationship must meet the traditional legal tests. By defending the imposition of blanket vicarious liability upon refiners for the acts of their retailer-lessees, the dissent demonstrates that it is unfamiliar with the factors and elements which establish the employment relationship or its equivalent. The statutes and decisions in the unemployment compensation area furnish a good example.

Many states have incorporated into their unemployment insurance statutes a three-fold test of what constitutes an employer-employee relationship. *See, e. g.,* 11 Del.Code Ann. § 19–3302(9)(A) (1975); 16 Code Ga.Ann. § 54–657(h)(6) (1975 Supp.); Burns Ind.Stat.Ann. § 22–4–8–1(a) (1974); 23 La.Rev.Stat. § 1472(12)(E) (1950); 8A Ann.Code Md.1957, Art. 95A, § 20(6) (1975 Supp.); 48 Neb.Rev. Stat. § 604(5) (1971 Supp.); 9 Va.Code Ann. § 60.1–14(b) (1973); 11 Rev.Code Wash. § 50.-04.140 (1958); 17 Wis.Stat.Ann. § 108.02(3)(b) (1974). Under this test, the employer can prove that no employment relationship exists by showing that (1) the worker is free from control or direction in the performance of his work under his contract of service and in fact, and (2) the service is outside the usual course of the business for which it is performed, or it is performed outside of all the places of business of the enterprise for which such service is performed, and (3) the worker is customarily engaged in an independently established trade, occupation, profession or business. It is extremely likely that a great many service station lessees would meet this test and thus be held not to be employees of the refiner-lessor. In fact, lessees have been found to be independent contractors under these statutes where the necessary elements of control and direction were lacking. *Compare Huiet v. Great A&P Tea Co.,* 66 Ga.App. 602, 18 S.E.2d 693 (1942), *with Johnson v. Huiet,* 67 Ga.App. 638, 21 S.E.2d 437 (1942), *and Young v. Bureau of Unemployment Comp.,* 63 Ga.App. 130, 10 S.E.2d 412 (1940); *and compare Wolff Co. v. Riley,* 24 Wash.2d 62, 163 P.2d 179 (1945), *with State v. Goessman,* 13 Wash.2d 598, 126 P.2d 201 (1938), *and McDermott v. State,* 196 Wash. 261, 82 P.2d 568 (1938).

Under the federal unemployment insurance statute, 26 U.S.C. §§ 3121(d)(2), 3306(i) (1970), common law rules are used to determine if the relationship between the worker and the person for whom he performs the services is the legal relationship of employer and employee. Generally, such relationships have been found to exist when the person for whom the services are performed has the right to control and direct the worker, *not only as to the result to be accomplished by the work but also as to the details and means by which such result is accomplished.* Treas.Reg. § 31.3121(d)–1(c) (1956). A wide range of factors and elements that bear on a finding of control are discussed in Social Security Handbook, DHEW No. (SSA) 73–10135, §§ 804–24 (5th ed. 1974). Under the federal statute, the Internal Revenue Service has found several service station lessees to be "employees" of the lessor oil company, but has also found others not to be employees. *Compare, e. g.,* Rev.Rul. 70–443, 1970–2 Cum.Bull. 212, *with* Rev.Rule. 69–305, 1969–1 Cum.Bull. 259. *See also United States v. Wholesale Oil Co.,* 154 F.2d 745 (10th Cir. 1946). It is thus arbitrary action to decree that all refiners are liable for the negligent acts of their lessees.

**21.** 39 Fed.Reg. 13177 (April 11, 1974) [J. App. 11]. The EPA explained the bases for its conclusions about control as follows:

In its determination that branded refiners control or have the ability to control the distribution of branded product to the consumer, EPA relied upon (1) the branded refiners' legal obligation as marketers of a trademarked and nationally advertised product to protect the quality of the trademarked product, (2) the extensive quality control system already operated by the branded oil compa-

there is no support for this conclusion in the record. Indeed, as the dissent admits, "[n]ot a single refiner submitted a sample lease agreement." Dissent 177 U.S.App. D.C. at ——, 543 F.2d at 283. The burden of supporting the agency regulation with evidence of control by lessors rests upon the agency and not upon the refiners. Without doubt, the lease agreement is the single most important factor in establishing the lessor-lessee relationship, including the degree of control exerted by the former over the latter. And yet, without considering a single lease, the EPA has here concluded that *all* refiners exercise a degree of control over all their lessees sufficient to justify the application of vicarious liability in every case. This is the thrust of our holding; what degree of control is "sufficient" is a question which we do not now address.

No contrary result is required by our prior opinion in this case. In striking down the liability provisions of the previous regulations in *Amoco I*, we held that

> [r]efiners and distributors must have the opportunity to demonstrate freedom from fault. . . . A refiner which can show that its *employees, agents, or lessees* did not cause the contamination at issue, and that the contamination could not have been prevented by a reasonable program of contractual oversight, may not be held liable . . . .

163 U.S.App.D.C. at 189, 501 F.2d at 749 (footnote omitted, emphasis added). Curiously, the dissent reads this passage to "plainly" mean that a refiner can be held responsible when contamination results from the negligent act of a lessee, dissent 177 U.S.App.D.C. at ——, 543 F.2d at 280, and in its footnotes goes even further

nies to meet this obligation and to protect business good will, and (3) the success of the American Oil Company in developing and implementing quality control procedures for distribution of unleaded gasoline.

39 Fed.Reg. 13175 (April 11, 1974) [J. App. 9]. Thus the EPA's decision that the refiners have "sufficient control" over their lessees to prevent contamination was made in the abstract, without descent to the particulars of the individual contractual relationships. The EPA also appears to have interpreted a willingness on the part of a refiner to stand behind the quality of its branded product as evidence that the refiner controls the actions of its retailers. 39 Fed.Reg. 13177 (April 11, 1974) [J. App. 11]. While that may indicate a commitment toward providing the best distribution system possible, it does not demonstrate day-to-day control of operations. In contrast to these speculations by the agency, we note the general disclaimer of responsibility for the actions of retailers issued by *all* refiners, *id.*, and the EPA's own comments regarding its amendments to the proposed new liability section:

> The amendments proposed qualified the liability of branded refiners for violations caused by illegal acts and for certain violations occurring in the jobber distribution chain. This proposal was in response to the objections of branded refiners that they lacked sufficient control of the branded distribution chain to prevent affirmative misconduct by retailers or distributors resulting in a violation.

39 Fed.Reg. 42357 (December 5, 1974) [J. App. 2]. It is interesting that the EPA could accept the refiners' argument that they do not have

sufficient control over their retailers to be held responsible for affirmative misconduct and yet still determine that there is sufficient control to hold the refiners liable for the *negligent* actions of their lessees.

The dissent argues that the EPA relied on an FTC *Report on Anticompetitive Practices in the Marketing of Gasoline* as demonstrating the "coercive power which the short-term lease gives to refiners to control marketing practices." Dissent 177 U.S.App.D.C. at —— n.11, 543 F.2d at 282 n.11. When read, however, the report makes only one point of significance: retail dealers operate pursuant to leases that can be cancelled at the option of the lessor-refiner. We seriously doubt whether such a lease provision could be relied upon to the exclusion of other provisions which may detail the division of responsibility for the station's operations; and we note that the statement quoted by the dissent from the report deals with price-fixing rather than with control over equipment maintenance and station procedures. The sort of possible control over the otherwise independent retail dealer which the FTC *Report* condemns, and which the dissent relies upon, has been held illegal. *See, e. g., Simpson v. Union Oil of California*, 377 U.S. 13, 84 S.Ct. 105, 12 L.Ed.2d 98 (1964). Since oil refiners are likely to be wary of engaging in the future in conduct which has been held to violate the antitrust laws, the EPA's total reliance on this *Report* is not justified. In any case, we do not think a generalized statement such as this would justify imposing vicarious liability on *all* retail-lessees; the facts and circumstances of the individual relationship must be examined.

by interpreting it to mean that this court held, "on the basis of the record then before it, that EPA had made a sufficient showing to justify placing vicarious liability on refiners—in this narrow context—for contamination caused by lessees." Dissent 177 U.S.App.D.C. at —— n.1, —— n.9, 543 F. 2d at 280 n.1, 282 n.9. We, however, can find no language in that opinion addressed to the sufficiency of the EPA's showing or to the question of when a refiner *can* be held liable for the actions of his lessee; nor does it "state with some precision the outer boundaries for the new liability regulations that EPA was sure to promulgate." Dissent 177 U.S.App.D.C. at —— n.1, 543 F.2d at 279 n.1. The passage "plainly" addresses only the issue then before this court, *i. e.*, the circumstances under which a refiner *may not* be held liable.[22] It goes no further.

Therefore, to validate the existing regulations, the phrase "whose assets or facilities are not substantially owned, leased, or controlled by the refiner" must be stricken from 40 C.F.R. § 80.23(b)(2)(iv) (1975). This will then permit refiners to escape liability if they can prove that the contamination was caused by the *action of a directly-supplied lessee.* Otherwise, the regulation exceeds the authority conferred on the Administrator by the statute, 42 U.S.C. § 1857f–6c(c)(1), and is "arbitrary . . . [and] not in accordance with law." 5 U.S.C. § 706(2). As we view the law the refiner cannot be held liable for the negligence of

every retailer merely because he owns and leases the premises where his products are sold.

*Judgment accordingly.*

J. SKELLY, WRIGHT, Circuit Judge (dissenting):

The only issue left in this case is whether refiners may be held vicariously liable for contamination of unleaded gasoline negligently caused by their lessee-retailers. It ought to be dispatched in one sentence. This court has already ruled on it in favor of EPA, and all the current petitioners were parties to that lawsuit. *Amoco Oil Co. v. EPA*, 163 U.S.App.D.C. 162, 501 F.2d 722 (1974) (*Amoco I*). In *Amoco I* we passed on the original liability provisions—which were too strict—and we set forth carefully the limits any new provisions would have to meet: .

> Refiners and distributors must have the opportunity to demonstrate freedom from fault. A distributor which can show that its employees and agents did not cause the contamination at issue may not be held liable * * *. A *refiner* which can show that its employees, agents, *or lessees* did not cause the contamination at issue, and that the contamination could not have been prevented by a reasonable program of contractual oversight, may not be held liable * * *.

163 U.S.App.D.C. at 189, 501 F.2d at 749 (footnote omitted; emphasis added).[1]

---

**22.** The fact that these petitioners were given a chance in *Amoco I* to attack the agency record for the regulations at issue there, *which were struck down*, cannot be thought to deprive them of a right to attack the evidentiary basis of the *new* regulations. After *Amoco I*, the agency was well aware of petitioners' objections that the imposition of vicarious liability was not sufficiently supported by the record. *See Amoco I*, 163 U.S.App.D.C. at 171, 501 F.2d at 731. Our opinion cannot fairly be read otherwise. To allow petitioners to again raise the question after the EPA has had an opportunity to correct the record is no "ambush."

**1.** The majority makes much of the fact that this passage from *Amoco I* is phrased negatively: "We * * * can find no language in [*Amoco I*] addressed * * * to the question of when

a refiner *can* be held liable for the actions of his lessee[.] * * * The passage 'plainly' addresses only * * * the circumstances under which a refiner *may not* be held liable. It goes no further." Majority op. 177 U.S.App. D.C. at ——, 543 F.2d at 279 (emphasis in original; footnote omitted).

For the majority to read the passage in this fashion is mechanical to say the least. Of course the passage *does* go further. Though phrased in the negative, it plainly imports an affirmative holding. The *Amoco I* court was presented with the question of what statutory and constitutional limits liability regulations must meet. The court found that the original regulations exceeded the limits, but it did not stop with that bare holding; it went on, in accordance with sound principles of judicial economy, to state with some precision the out-

EPA expressly relied on this passage from our opinion in promulgating its new regulations. 39 Fed.Reg. 42357–42358 (December 5, 1974), JA 2–3. Those regulations conform precisely to our mandate. They give refiners an opportunity to demonstrate freedom from fault, but they also hold refiners responsible when contamination results from the negligent act of an employee, agent, *or lessee.*

Petitioners, eleven refining companies who were among the petitioners in *Amoco I,* now challenge the new regulations and assert that we meant something other than what we plainly said in the earlier case. Even if their assertion had any merit, it cannot be pressed in this fashion. It should have been raised on a petition for rehearing in *Amoco I.* The petitioners never filed such a petition, nor did they seek further review of òur decision there. That judgment is final, and it controls this case.

Assuming, as the majority has, that we are to consider the matter anew, I still find that EPA's regulations are unquestionably valid. In the first place, the dispute rages over a very small class of contamination incidents—those caused by lessee negligence. If the lessee deliberately brings about contamination, the refiner escapes liability under 40 C.F.R. § 80.23(b)(2)(ii) or § 80.23(e) (1975).[2] And the lessee has precious few opportunities to cause non-deliberate—negligent—contamination. The refiner both controls deliveries of gasoline to the station by tank truck, JA 386–388, and maintains substantial control over the equipment that will handle the gasoline at the station, since the refiner initially installed the equipment and remains the owner of it, charged with its continuing care.

More importantly, the majority overstates the showing required before society may validly impose vicarious liability, and then relies on speculation that finds no support in the record in order to conclude that its overblown requirements have not been met. I take issue on both points.

The majority indicates that there must be "some closely integrated relationship"[3] or "compelling evidence of control" before refiners may be held vicariously liable. Majority op. 177 U.S.App.D.C. at ——, 543 F.2d 276. We may assume that the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act's ban on arbitrary or capricious agency action, 5 U.S.C. § 706 (1970), do require some degree of relationship and control as a predicate for imposing vicarious liability, but the majority never reveals why it insists on such a very high degree.

The majority does express some shock at the notion that vicarious liability may occasionally result in loss to a refiner that has "made every human effort possible" to avoid contamination. Majority op. 177 U.S. App.D.C. at ——, 543 F.2d at 274. But this, in itself, is no ground for striking down the regulation. Employers—to use the most common example of vicarious liability—are held responsible every day for torts of employees even where they have taken all possible steps to avoid the injury. Dean Prosser, in the very passage of his treatise cited by the majority, makes this unsurprising proposition entirely clear.[4]

---

er boundaries for the new liability regulations that EPA was sure to promulgate. And in the quoted passage the court held, on the basis of the record then before it, that EPA had made a sufficient showing to justify placing vicarious liability on refiners—in this narrow context— for contamination caused by lessees. I find it impossible to understand how anyone could be misled by the stylistic choice of negative phrasing; the passage is clearly meant to provide affirmative guidance for EPA as it considered new regulations.

2. The regulations are set out in full in footnote 7 of the majority opinion.

3. The majority cites Dean Prosser for this requirement, but Prosser speaks only of "some relation" and breathes no hint of a requirement that the relation be closely integrated. W. Prosser, Law of Torts 458 (4th ed. 1971).

4. A is negligent, B is not. "Imputed negligence" means that, by reason of some relation existing between A and B, the negligence of A is to be charged against B, although B has played no part in it, has done nothing whatever to aid or encourage it, *or indeed has done all that he possibly can to prevent it.* * * *

Employers' vicarious liability is no longer controversial. No one suggests that its imposition is either arbitrary or unconstitutional. EPA was entitled to conclude that the same factors which make vicarious liability for employee torts acceptable also render acceptable EPA's much more limited ruling that refiners shall assume responsibility for lessee-caused contamination.

Vicarious liability—like other forms of strict liability—is imposed not because there is "compelling evidence of control," but rather because some properly authorized agency of government—court, legislature, or administrative body—has determined that such an allocation of responsibility will serve society's ends. The determination may rest on the judgment that it is more just to impose liability on the party who entered the business knowing of the general hazards, rather than risk leaving the entire loss on the innocent injured party.[5] Or—more importantly for our purposes—it may derive from the judgment that vicarious liability will create incentives which lead, in the long run, to reducing the number of injuries.[6] Here it is hardly irrational to conclude that making refiners liable for contamination caused by lessee negligence will serve to reduce contamination. Under the regulations refiners are given a clear incentive to choose their lessees carefully and to refuse to renew the leases of operators with poor contamination records. Moreover, the regulations work to encourage the refiner-owners to install equipment which itself minimizes the chances that lessee negligence will result in contamination. The regulations thus plainly serve the paramount goal of protecting the consumer and keeping emission control devices functioning properly.

The majority acts as though the tests for vicarious liability have been cast in concrete, as though liability must always turn upon the familiar dichotomy between employee and independent contractor.[7] This may well be a serviceable distinction when applied to exonerate the refiner of responsibility for most negligent torts committed by a lessee-retailer or the lessee's employees. But it simply does not apply here. EPA is not trying to hold refiners liable for every personal injury caused by lessees or their employees. Its regulations are narrowly focused on one specific evil, and in this limited area, because of the realities of the gasoline distribution system, JA 386–388, vicarious liability of refiner-lessors is a sensible and permissible control strategy.

EPA's regulations are designed to deter what amounts to a "new tort"—call it negligent contamination or negligent impairment of an emission control device.[8] It is a new form of injury which has resulted from advancing technology coupled with increasing public demand for clean air. Contrary to the majority's repeated intimations, there is no "settled law" governing responsibility for this particular narrowly-defined class of injuries. Nothing in the Constitution, the Clean Air Act, or the Administra-

W. Prosser, *supra* note 3, at 458 (emphasis added).

**5.** *See id.* at 459; Smith, *Frolic and Detour,* 23 Colum.L.Rev. 444, 452–457 & n.34 (1923).

**6.** *See* Calabresi, *The Decision for Accidents: An Approach to Nonfault Allocation of Costs,* 78 Harv.L.Rev. 713, 727–728 (1965); Seavey, *Speculations as to "Respondeat Superior",* quoted in H. Shulman & F. James, Cases and Materials on Torts 116–118 (2d ed. 1952).

**7.** The traditional vicarious liability rules are of course relevant in deciding whether EPA's action here accords with the Constitution and the Administrative Procedure Act, but they are by no means dispositive.

**8.** Perhaps it is not entirely accurate to consider EPA's regulations under the "tort" rubric. EPA does not purport to alter the standards that would govern in a private suit brought, for example, by someone whose catalytic converter was fouled by contaminated gasoline. It appears that such suits will still be governed by the traditional common law rules which the majority tirelessly invokes, depending, of course, upon the law of the state where the injury occurs. Rather, EPA's regulations impose vicarious liability only for the civil penalties which Congress authorized under § 211(d) of the Clean Air Act, 42 U.S.C. § 1857f–6c(d) (1970). This is all the more reason to refrain from importing wholesale into the administrative scheme the common law distinction between employees and independent contractors.

tive Procedure Act dictates that the liability rules here must conform precisely to the vicarious liability rules that continue to apply to other, more familiar, types of injuries.

The experience of recent years in the products liability field ought to prompt caution before one adopts a stance as rigid as the majority's. In that field, strict liability has been found, in an avalanche of recent cases, to serve society's ends better than the old doctrines of warranty and privity that seemed solidly entrenched only a few years ago.[9] Those liability standards changed—rapidly and dramatically—in response to advancing technology, new and more remote relationships between manufacturers and consumers, changing societal perceptions about where the burden should justly fall, and emerging views about what strategies would best deter injuries. In a similar vein, one certainly ought to consider with an open mind the possibility that comparable factors might make appropriate different vicarious liability standards for the narrowly limited class of "torts" upon which EPA focused.

EPA is, beyond doubt, the properly authorized body to choose the liability standards that will best achieve the purposes of the Clean Air Act. This court is not to second-guess EPA's decision.[10] Our only function is to assure that EPA acted within the broad limits set down by statute and the Constitution. We check only to see that the record reveals sufficient control by the refiners over lessee-retailers that EPA's imposition of liability on the refiners is neither arbitrary nor capricious. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–286, 290, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

EPA explicitly found that refiners have "sufficient control of facilities owned or leased by them to prevent contamination of unleaded gasoline * * *." 39 Fed.Reg. 13177 (April 11, 1974), JA 11. As support for its position EPA noted that at lessee-operated stations it is the refiner-owners who make "basic decisions respecting the conditions of sale of unleaded gasoline," particularly decisions about equipment. *Id.* EPA also observed that a refiner "has sufficient control to limit his exposure to liability in such cases and may, of course, seek indemnity." *Id.* at 13178, JA 12.

The record supplies adequate support for EPA's determinations.[11] My colleagues

**9.** *See* W. Prosser, *supra* note 3, at 654–658; Restatement (Second) of Torts § 402A (1965); Prosser, *The Assault Upon the Citadel,* 69 Yale L.J. 1099 (1960); Prosser, *The Fall of the Citadel,* 50 Minn.L.Rev. 791 (1966).

**10.** I would observe that where no responsible government agency is authorized to act, this court has in the past itself imposed on lessors a high standard of responsibility to lessees and to the public. *See Javins v. First National Realty Corp.,* 138 U.S.App.D.C. 369, 428 F.2d 1071, *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).

**11.** For example, *The Federal Trade Commission's Report on Anticompetitive Practices in the Marketing of Gasoline* was made a part of the record before EPA. JA 130–204. The FTC noted the coercive power which the short-term lease gives to refiners to control marketing practices. JA 158–164. It wrote:

There are approximately two hundred thousand lessee dealers operating in today's gasoline market. Their individual investments in their businesses range from a few hundred dollars to several thousand. These dealers operate stations pursuant to leases which may be cancelled at the option of the lessor. In the great majority of cases, the duration of the lease is one year.

A dealer whose lease is terminated at his supplier's option frequently finds himself faced with a severe financial set-back. He may have a considerable sum of money invested in equipment for which he cannot obtain what he considers the true market value or which he cannot use in whatever new location he may be able to secure. The customer good-will and employee relationships he has built up over the years are completely lost unless he can obtain a new location within the same marketing area. And, the complainants allege, dealers terminated for failure to follow supplier "suggestions" [as to retail price] frequently are unable to obtain leases from other suppliers because of "bad reputation."

JA 160–161. The FTC concluded:

As a result of marketing practices on the part of suppliers, the retail dealer's position is

themselves even concede that some lease agreements may contain "strong evidence of control by the refiner." Majority op. 177 U.S.App.D.C. at ——, 543 F.2d at 276. They go on, however, to speculate that is is "possible" that a lease may affirm lessee independence. The paucity of record support for this speculation is striking. Although a number of refiners commented on the proposed regulations, only one even bothered to refer specifically to the lessee-retailer issue. JA 34–36. That refiner—who is not a petitioner here—rested content with a generalized disclaimer of control over lessees. Not a single refiner submitted a sample lease agreement or any other documentation that would support that disclaimer. They failed to do so despite EPA's careful request, in the notice of proposed rulemaking, that "comments addressed to the relationships between branded refiners and other elements of the distribution system be factual and specific and that examples of contracts or other documents illustrating those relationships be submitted where pertinent." 39 Fed. Reg. at 13178, JA 12.

The cases cited by the majority furnish no better support for its position. They all arose in drastically different contexts. To the extent they relate to the issue of lessee independence at all, they decide only that lessees are sufficiently independent to justify particular applications of the antitrust laws, e. g. *Simpson v. Union Oil Co.*, 377 U.S. 13, 20, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *Peter v. Union Oil Co.*, 328 F.Supp. 998, 1001 (C.D. Cal. 1971); *United States v. Richfield Oil Corp.*, 99 F.Supp. 280, 293–294 (S.D. Cal.), *affirmed*, 343 U.S. 922, 72 S.Ct. 665, 96 L.Ed. 1334 (1951), or that lessees are sufficiently independent that their employees will not be considered employees of the refiner under the labor laws. *Site Oil Co. v. NLRB*, 319 F.2d 86, 93 (8th Cir. 1963). The cases say nothing whatever about imposition of vicarious liability.[12] That lessees are

largely that of an economic serf rather than that of an independent businessman. * *

JA 172. The FTC report is dated June 30, 1967, but nothing in the record suggests that the situation has changed in relevant respects in the intervening years.

The majority criticizes EPA for what it regards as deficiencies in the record, and especially for EPA's failure to descend to the particulars of individual lease agreements used by each refiner. Perhaps if EPA were writing on a blank slate, there would be grounds for demanding a more complete record—although I by no means concede that even in that case the record here would be inadequate. But the point is that EPA did not write on a blank slate. It had already presented a very substantial record to this court in *Amoco I*, and the court held there that, *based on the Amoco I record*, EPA was justified in imposing vicarious liability on refiners for contamination caused by lessees. 163 U.S.App.D.C. at 189, 501 F.2d at 749. EPA was certainly entitled to conclude that the question was resolved, that it had judicial approval for imposing vicarious liability on refiners for lessee-caused contamination, and that it did not again have to compile a massive record to resolve a question that was already settled.

The majority here gives petitioners an entirely undeserved gift. They were parties to the *Amoco I* litigation. They permitted that judgment to become final without a murmur

against the vicarious liability holding. EPA expressly relied on that holding in promulgating the new regulations, and no doubt that reliance helped shape EPA's decisions about what kind of information to seek and to place in the record. We surely would be faced with a different record had EPA been considering the matter *de novo*. For petitioners now to ambush EPA with an attack on the adequacy of the record on this very point is entirely unwarranted. For the majority to let them get away with it is deeply distressing.

**12.** Petitioners have also invoked cases wherein courts declined to impose liability on refiners for personal injuries caused by the tortious behavior of lessees. But these cases likewise are beside the point. This is clear upon examination of *Smith v. Cities Service Oil Co.*, 346 F.2d 349 (7th Cir. 1965), the case which receives principal reliance in petitioners' brief. A young boy was burned as a result of a Michigan station operator's negligence while he repaired the boy's family's car. The family sued the refiner which owned the station and whose products were sold there. Under Michigan law the refiner-lessor would not be liable unless the station operator could be considered the refiner's agent in performing the activities that led to the injuries. The court undertook a careful factual inquiry and decided that, under the circumstances, Cities Service did not come within the Michigan requirements. *Id.* at 352.

judged independent for some limited purposes obviously does not mean they must be considered fully independent for all purposes.

EPA properly found "sufficient control" to justify holding refiners liable for negligent contamination at lessee-operated stations. Applying the proper standard of review, this court has no basis whatever for finding EPA's action irrational or arbitrary or capricious. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* *supra.*

I respectfully dissent.

But the court there was engaged in *applying* standards already established by Michigan law. In our case, by contrast, EPA is empowered to *create* the standards for responsibility in the first place. There is no reason whatever to think that *Smith's* application of Michigan law marks the outer constitutional and statutory boundaries for the essentially legislative decision entrusted to EPA.

Perhaps the key to the majority's misapprehension of the real issues in this case lies in its failure to appreciate this distinction between applying given standards and establishing new ones. It repeatedly acts as though Congress had directed EPA to *apply*—lock, stock, and barrel—the traditional standards of vicarious liability. I do not know what else to make of the majority's repeated invocation of such phrases as "settled law," "traditional vicarious liability," and "ancient rule," *see* majority op. 177 U.S.App.D.C. at ——, ——, and footnotes 12 & 20, 543 F.2d at 275, 276 and footnotes 12 & 20, nor can I otherwise understand its apparent insistence that EPA must find "the employment

relationship or its equivalent" before imposing vicarious liability. *Id.* at footnote 20.

One may scan the Clean Air Act in vain for any hint that Congress meant EPA to take such a crabbed view of its role. Instead, Congress gave EPA broad authority to "control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive" found to impair emission control devices. 42 U.S.C. § 1857f–6c(c)(1) (1970). The liability regulations are merely a part—a logical and necessary part—of EPA's control strategy. Moreover, Congress authorized EPA to control such additives "by regulation." *Id.* Rulemaking hardly provides EPA the opportunity to perform the impossible task the majority would apparently require: "EPA must examine the indicia of control in *each* refiner-lessee relationship." Majority op. 177 U.S.App.D.C. at ——, 543 F.2d at 277 (emphasis added). (There are approximately 200,000 lessee-operated stations in the country. JA 160.) Plainly Congress did entrust EPA with a quasi-legislative task. By treating EPA's role as one of mere application, the majority takes far too narrow a view.