**NATIONAL TANK TRUCK CARRIERS, INC., Petitioner,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and William K. Reilly, Administrator, Respondents.**

No. 89–1289.

United States Court of Appeals, District of Columbia Circuit.

Argued April 17, 1990.

Decided June 26, 1990.

Gary Letcher, Anchorage, Alaska, of the bar of the Supreme Court of Alaska, pro hac vice, by special leave of the Court, for petitioner. Timothy L. Harker, Washington, D.C., was on the brief for petitioner.

David J. Kaplan, Atty., Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., and Eileen T. McDonough, Atty., Dept. of Justice, Michael S. Winer, Robert J. Martineau, Jr., Attys., E. Donald Elliott, Gen. Counsel, and Alan W. Eckert, Associate Gen. Counsel, E.P.A., were on the brief, for respondents.

Before SILBERMAN, WILLIAMS, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

This is a petition for review of certain regulations issued by the Environmental Protection Agency ("EPA"). The regulations impose presumptive liability on tank-truck carriers of gasoline when the carriers transport gasoline that exceeds certain "volatility" levels. The tank-truck carriers ask us to find that the EPA acted arbitrarily and capriciously in promulgating these regulations. In particular, we must determine whether or not the affirmative defenses to the liability presumption are arbitrary and capricious.

We grant the petition for review in part. We uphold the volatility regulations with the exception of the affirmative defense requirement that carriers be able to produce documentation from the shippers attesting to the lawfulness of each shipment even though the regulations do not impose a corresponding obligation on shippers that they provide the carriers with such documentation. The agency's reasoning on this particular point is essentially nonexistent, does not respond to the concerns that petitioners voiced in the administrative proceedings, and is therefore arbitrary, capricious and unlawful. At the very least, EPA must give a reasoned and adequate explanation as to why it has not required shippers to provide the relevant volatility-level documents to carriers.

On all other issues, the petition for review is denied.

## I. BACKGROUND

The regulations at issue are the Volatility Regulations for Gasoline and Alcohol Blends Sold in Calendar Years 1989 and Beyond. They were promulgated pursuant to section 211(c)(1) of the Clean Air Act, 42 U.S.C. § 7545(c)(1),[1] published at 54 Fed. Reg. 11,868 (1989), and will be codified at 40 C.F.R. Part 80—Regulation of Fuels and Fuel Additives.

National Tank Truck Carriers, Inc. ("the carriers" or "NTTC") represents the approximately 225 motor carriers that transport commodities in bulk on a for-hire basis. They are common carriers that serve as a link between distribution points and retailers. When a carrier transports gasoline, it is presumptively liable when these volatility regulations are violated while the gasoline is within its purview. In this situation, the carrier has certain affirmative defenses. The presumption of liability extends down the distribution chain of carriers of blended fuel.

1. Section 211(c)(1) provides in relevant part: The Administrator may ... control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine ... if in the judgment of the Administrator any emission product of such fuel or fuel additive causes, or contributes, [sic] to air pollution which may reasonably be anticipated to endanger the public health or welfare....

### A. *Volatility*

"Volatility" is a measure of gasoline's tendency to evaporate. Because gasoline vapors on hot days can form ground-level concentrations of ozone, the EPA undertook to regulate the amount of gasoline vapor emitted during the summer months. The level of volatility depends upon the hydrocarbon mix in the gasoline: the greater the amount of lighter hydrocarbons, the more volatile the gasoline. Lighter hydrocarbons (such as butane) are added because they are cheaper than gasoline. Volatility is measured in terms of Reid Vapor Pressure ("RVP"): the greater the RVP, the greater the volatility of the gasoline and the larger the amount of ozone formed.

### B. *Liability and Enforcement*

After determining appropriate volatility standards for various parts of the country, the EPA decided to make all points in the gasoline distribution chain—including carriers—liable for violations of those standards. An entity can violate the standards either by introducing additives that raise the RVP of the mix or by transporting (or causing to be transported) gasoline with an RVP level higher than the level assigned to the gasoline's destination. As a method of enforcement, the agency rejected the possibility of tracing the offending gasoline back through the documentation that is already required in order to find the actual violator; rather, it adopted a system of presumptive liability. EPA based this decision on the grounds that (1) the fungible nature of gasoline precluded "paper trail" tracing; (2) its study demonstrated that tracing would entail high costs with meager results; and (3) state regulatory programs (for example, California) had experienced difficulty with the tracing approach.

The final regulations define a "carrier" as "any distributor who transports or stores or causes the transportation or storage of gasoline without taking title to or otherwise having any ownership of the gasoline, and without altering either the quality or the quantity of the gasoline." 54 Fed.Reg. at 11,883. A carrier is presumptively liable when EPA finds noncomplying gasoline in the carrier's tank. *Id.* at 11,-885. When EPA finds noncomplying gasoline further down the distribution chain (for example, at a service station), the burden shifts: the carrier is liable only if EPA can show that the carrier caused the violation. *Id.*

### C. *Affirmative Defenses and Ethanol Blenders*

The regulations provide an affirmative defense to the presumption of liability. The defense consists of three elements, all three of which a carrier must establish in order to defeat the presumption of liability: (1) documentation from the entity from which the carrier received the gasoline, showing a lawful RVP level; (2) evidence of the carrier's periodic sampling program designed to monitor the RVP level; and (3) evidence that the carrier did not cause the violation. *Id.* at 11,885–11,886.

There is also a separate category of regulations for "ethanol blenders." EPA defines an ethanol blender as one who owns or controls an "ethanol-blending plant." *Id.* at 11,883. An ethanol-blending plant is defined as a refinery where gasoline is produced only by means of the addition of ethanol to gasoline. *Id.* Most ethanol blending is actually done in the tank trucks: the ethanol is added and the motion of the truck blends the fuel (thus, "splash blending"). *Id.* at 11,873. Carriers that splash blend are classified as ethanol blenders because EPA has concluded that they meet the regulatory definition of "refinery." An ethanol blender thus ceases to be a carrier and therefore no longer benefits from a carrier's limited presumptive liability; rather, the blender is presumed liable for violations discovered at any subsequent point in the distribution system. *Id.* at 11,885. To rely upon its affirmative defense, a blender must also meet a higher standard. In addition to satisfying the three elements applicable to carriers, the blender asserting its affirmative defense must also demonstrate that the offending gasoline contained no more than 10% ethanol when it left the blender's control. *Id.* at 11,886.

## II. DISCUSSION

### A. *The Parties' Positions*

The essence of the carriers' argument is that "unlike gasoline refiners and distributors and retailers who directly affect the volatility of gasoline, motor carriers do not take title to, or control or affect the content and quality of, the gasoline they transport." Brief for NTTC at 7. According to the carriers, therefore, the presumptive liability standard applicable to other segments of the gasoline industry is irrational when applied to carriers. Any of EPA's articulated concerns about placing liability can be readily satisfied, the carriers argue, by documentation received from the upstream facility.

Not only do the carriers' contracts bar them from affecting the cargo, they claim, but the carriers also deny any economic incentive to alter fuel (again, because they are transporters only). Because they have no control over the product, the carriers argue, the volatility regulations (1) actually establish *vicarious* rather than *presumptive* liability, and (2) therefore violate basic principles of agency law. Besides their lack of control, the carriers note that they have only one point of origin for each load, that *gasoline products in the tanks are* compartmentalized so that commingling does not occur, and that therefore gasoline is not fungible as to the carriers.

The carriers urge us to order the EPA to adopt "a less punitive, alternative means of enforcement than presumptive liability [which] was available to the Agency, but not considered." Brief for NTTC at 15. The means preferred by the carriers is to trace gasoline through shipping documents, documents that EPA is guaranteed to receive from refiners and distributors because of the presumptive liability imposed upon those entities. Because EPA is guaranteed to receive these documents, the carriers argue, presumptive liability is irrational as actual liability—causation—can be established.

EPA asserts that there is a danger of mis-routing—that a carrier through ignorance or otherwise could deliver gasoline intended for one RVP area to another RVP area and thereby violate the standards. *See* Summary and Analysis of Public Comments on Enforcement Portions of Gasoline Volatility Notice of Proposed Rulemaking 1989 (August 19, 1987) 76 ("Public Comments"), Joint Appendix "JA" at 315. The carriers respond that this is a speculative possibility, which *in any event does not* require presumptive liability because of the presence of shipping documents. The carriers argue further that EPA has the better access to the necessary documentation: "[T]he regulations do not require the refiner or distributor to provide any documentation to the motor carrier concerning the vapor pressure of the gasoline delivered to the motor carrier." Brief for NTTC at 22 (footnote omitted).

The carriers also attack EPA's reliance on its experience with the burdens of proof in its unleaded fuels regulations. In the unleaded fuels program, EPA claims, "there is no presumption of liability for carriers. Consequently, EPA has had difficulty making determinations of carrier liability." Public Comments at 57, JA at 296. The carriers argue that "by offering the one scheme to justify the other, the Agency begs the fundamental question of whether it is arbitrary to treat motor carriers like refiners and pipelines." Brief for NTTC at 24.

The carriers next turn to the question of the affirmative defenses. They argue that the regulations violate traditional standards of vicarious liability and fail the rule of *Amoco Oil Co. v. EPA,* 543 F.2d 270 (D.C.Cir.1976) ("*Amoco II*") (agency's imposition of vicarious liability is to be governed by traditional common-law rules), because the regulations require the carrier to produce "exculpatory" documentation from shippers (refiners or distributors, usually), yet fail to require that shippers provide such *documentation to carriers.* The carriers claim, without citation, that they cannot refuse a shipment because of (1) economic position and (2) common-carrier regulations. Thus, EPA has allegedly imposed "strict vicarious liability."

The carriers also protest that there is no evidence that an RVP monitoring program

has ever been conducted, or that such a program is safe, or that carriers even have contractual authority to take samples from their loads. The carriers attack as unlawfully vague the requirement that they undertake "periodic sampling and testing" because it subjects carriers to inconsistent, arbitrary or selective enforcement.

Finally, the carriers attack the provisions governing ethanol blenders, arguing that because these carriers have no control over the mix of the fuel, they cannot be considered refineries. The regulations will therefore require repeated, expensive and dangerous testing.

EPA responds that exempting carriers from the regulations would undermine its RVP program because presumed liability is the most effective method of achieving compliance. The agency argues that the regulations carefully limit carriers' liability to matters within the carriers' control (that is, to their own "facilities") and that the carriers are not responsible for the conduct of other entities in the distribution chain.

As support for the presumptive liability scheme, EPA points to its experience with the unleaded fuels program and to the comments of the California Air Resources Board concerning its experiences with state volatility regulations. The agency responds to the carriers' contentions that these observations are irrelevant (that is, because carriers do not affect the RVP of their loads) by noting that gaps in the chain must be avoided: "To maintain any degree of effectiveness, some measure of responsibility must be imposed on all entities in the manufacturing and distribution chain. Accordingly, the regulations prohibit the transport of noncomplying gasoline, regardless of where the additives increasing the RVP were added." Brief for EPA at 20–21. The agency reiterates the "misrouting" rationale noted above and argues that the carriers have not demonstrated that EPA's concern on this point is irrational. The fact that the record does not show any violations is not surprising, EPA argues, because the federal government had not previously regulated gasoline volatility.

A paper-trail approach is undesirable, the agency claims, because RVP data is not readily available through the system, because all documents lead only to the preceding party, and because document-tracing emphasizes orderly paperwork rather than substantive compliance. The agency also defends its reliance on its experience with the unleaded fuels program on the ground that the lack of presumptive liability against carriers in that program "had made it difficult for EPA to take effective enforcement action against carriers as warranted or to obtain information from carriers while investigating a violation." Brief for EPA at 24. *See also* Public Comments at 75–76, JA at 314–15.

Responding to the carriers' vicarious-liability argument, EPA asserts that the volatility regulations satisfy all the standards for vicarious liability set out in this Court's *Amoco* decisions. *See Amoco Oil Co. v. EPA*, 501 F.2d 722 (D.C.Cir.1974) ("*Amoco I*") (agency prohibited from imposing irrebuttable presumption of vicarious liability), and *Amoco Oil Co. v. EPA*, 543 F.2d 270 (D.C.Cir.1976) ("*Amoco II*") (agency's imposition of vicarious liability governed by traditional common-law rules). Because the regulations impose presumptive liability only for violations at the carrier's facilities, EPA claims, and because of the availability of affirmative defenses, a carrier can rebut the presumption merely by exercising control over its own facilities.

As to the carriers' concern that they will not have access to documents, EPA argues that the carriers did not raise the issue in their formal written comments and that shippers have an incentive to maintain and provide the proper documentation because these papers are part of their affirmative defense. Should a shipper fail to provide proper documentation, EPA points out, then the carrier can refuse the shipment. The carriers claim that their weak bargaining position and their duties as common carriers prevent them from refusing a shipment, but EPA again asserts that these economic and legal arguments were not raised in the administrative proceedings but only were mentioned in a meeting (subsequently memorialized by an EPA attor-

ney) between EPA staff members and representatives of the carriers.

Addressing the requirement that carriers operate an oversight program, EPA argues that such a plan is both rational and permissible under *Amoco I.* Similarly, the agency observes that the fact that the oversight requirement is new does not render it impractical; the carriers could enter into an arrangement with the owners for testing immediately before or after delivery; and the small size of the necessary samples, coupled with the fact that all parties have an interest in preventing the passage of unlawful gasoline, means that the carriers will be able to sample the load even though they do not have title to it. EPA claims that the carriers' safety concerns over the sampling requirement are unfounded because carriers that ship large amounts of gasoline over long distances can be assumed to be capable of exercising due care in sampling. EPA notes that it issued possible sampling procedures and that the record contains no specific instances to support the carriers' argument.

The standards are not impermissibly vague, EPA continues, because they suffice to put the carriers on notice as to what conduct is required and because EPA "deliberately chose to use language that enables the individual carrier to establish a program best suited to its needs, instead of setting forth a precise checklist of steps that must be taken to establish an oversight program." Brief for EPA at 34 (footnote omitted). The term "periodic" is sufficiently specific because the regulation covers too many circumstances to admit of a precise definition. As to possible abuse or inequities in enforcement, the EPA argues, that issue should be left to an enforcement proceeding.

Turning to the separate rules for carrier-blenders (most of which are ethanol blenders), EPA argues that because of the additional responsibility involved in blending, EPA's imposition of a different liability scheme for blenders is reasonable. The reasonableness of this regulation depends, of course, upon the reasonableness of the EPA's determination that carrier-blenders are "refineries"—plants where gasoline is produced—and that blenders should bear the liabilities of refiners. Blenders cannot be said to be held to a standard of strict liability, EPA claims, because of the affirmative defenses. Where the blender blends additives other than ethanol, it is treated as a straight refiner. Although blenders are less sophisticated than "traditional" refineries, such is all the more reason for a presumptive liability scheme, the agency claims, in order to assure compliance. EPA argues that only one test need be made, one immediately post-blend.

### B. *Standard of Review*

The scope of our review of the volatility regulations is determined by section 307(d) of the Clean Air Act, 42 U.S.C. § 7607(d). Under that provision, a reviewing court may reverse any action of the Administrator of the EPA that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," contrary to the Constitution, or in excess of statutory jurisdiction or authority. 42 U.S.C. § 7607(d)(9). This standard is highly deferential, and we "may not substitute [our] judgment for the agency's ... and [we] must affirm the agency's decision if a rational basis for it is presented." *Lead Industries Ass'n v. EPA*, 647 F.2d 1130, 1145 (D.C.Cir.), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980) (citations omitted). *See also Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 520–21 (D.C.Cir.1983). Indeed, "we can only make [the arbitrary and capricious] determination where the EPA has failed to consider the relevant factors for determination or has made a clear error of judgment." *National Steel Corp. v. Gorsuch*, 700 F.2d 314, 325 (6th Cir.1983) (citation omitted). We are especially inclined to uphold an agency's interpretation of its statutory mandate where "the regulatory scheme is technical and complex," but we may act upon that inclination only if the agency "considered the matter in a detailed and reasoned fashion." *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 865, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984). Thus, we should

uphold the volatility regulations if EPA's explanation of them is "a sufficiently rational one to preclude a court from substituting its judgment for that of EPA." *Chemical Mfrs. Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985).

As we explain in greater detail below, EPA considered the bulk of the asserted problems with the regulations "in a detailed and reasoned fashion," or at least in a fashion sufficiently rational to preclude us from substituting our version of an optimal volatility regulation system for the agency's regime. The same cannot be said, however, of the carriers' affirmative defenses, and in particular of EPA's determination that in order to mount a defense to their presumed liability carriers must display documentation from shippers that the shippers are not required to produce.

## C. *Vicarious Liability*

■ We are unpersuaded that the volatility regulations unlawfully place vicarious liability on the carriers. The carriers will be held liable only if they do not perform certain tasks that the regulations require and the gasoline that they carry exceeds the permissible RVP level. The fact that they do not take legal title to the gasoline or otherwise exercise dominion over the peculiar qualities of each batch of gasoline is irrelevant to the question of whether a carrier is or is not transporting unlawful gasoline in its truck, and it in no way imposes *vicarious* liability on the carrier, which is held liable only for the gasoline in its truck (or "facilities"), not the gasoline in someone else's facilities. EPA correctly notes that because the presumption goes only to the carrier's facilities, and because affirmative defenses are available, the presumption is both not vicarious and rebuttable. Unlike other regulated participants in the gasoline distribution chain, the carriers (except for ethanol blenders) are not responsible for the conduct of others in the chain. Although we understand the carriers' observation that ethanol blenders are unlike traditional refineries, we agree with the agency that because of the different liabilities involved, the imposition of a different regulatory regime for ethanol blenders is warranted. Even these carrier-blenders are not subject to strict liability, as the carriers charge, because the blenders may avail themselves of admittedly more stringent affirmative defenses.

Even if the volatility regulations posed a true vicarious liability issue, we agree with the agency that the regulations satisfy the standards set out in this Court's *Amoco* decisions. In *Amoco I,* 501 F.2d at 748–49, we held that EPA is prohibited from imposing an irrebuttable presumption of vicarious liability. The affirmative defenses provided here—once they are modified in light of our discussion below—prevent the agency from running afoul of *Amoco I.* In *Amoco II,* 543 F.2d at 275, we held that EPA must operate under traditional common-law rules of vicarious liability. Because the volatility regulations impose liability upon the carriers only when they transport unlawful gasoline (and not when someone else carries unlawful gasoline), the concerns that we voiced in *Amoco II* are not even implicated here.

■ The carriers urge us to order the agency to embark upon a "less punitive" course of tracing gasoline solely through shipping documents. Such a decision, however, is not ours to make. As long as the agency's regulations are not arbitrary and capricious, the fact that alternative regulatory mechanisms exist—even attractive or viable ones—does not mean that the agency's first choice is unlawful. *See Building and Constr. Trades Dep't, AFL–CIO v. Brock,* 838 F.2d 1258, 1271 (D.C.Cir.1988) ("If the courts were to force the Secretary to produce substantial evidence from the record to support his choice in every case of a difference, no matter how minor, between the rules he adopts and the proposals of every party to the rulemaking, his discretion would be illusory and the administrative and judicial review processes interminable."); *see also South Terminal Corp. v. EPA,* 504 F.2d 646, 655 (1st Cir. 1974). The same observation is true concerning the carriers' protests over EPA's "mis-routing" fears, as well as the agen-

cy's reliance on state regulatory results and on its experience with its unleaded fuel regulations.

■ Finally, neither the carriers' arguments that an RVP-testing program has never been conducted, nor their assertion that they lack contractual authority to test at all, nor their protest that the requirement of "periodic sampling and testing" is unlawfully vague present issues that are ripe for review. These and the carriers' related questions are more appropriately committed to an enforcement proceeding, and we decline to address them here.

### D. *Lack of Reciprocity in the Affirmative Defenses*

■ On brief and at oral argument, the carriers complained that it is irrational that the regulations require carriers, as part of their affirmative defense, to produce documentation attesting to the lawfulness of their load, yet impose no requirement on the shippers to provide such documentation. We agree that the affirmative defenses in their current state are arbitrary and capricious. At the very least, the agency has not established an adequate rationale for their current structure.

The agency argues that the carriers did not properly raise this issue in the administrative proceedings. Such is not the case. In the Comments of American Trucking Associations (EPA Docket Nos. A–85–21 and A–87–11) (February 11, 1988), JA at 195, 211, the carriers pointed out that "refiners and/or sellers should be required to certify fuel volatility on the shipping paper for every shipment so that EPA can ensure that its regulations can be enforced."

Similarly, in a memorandum from an EPA staff attorney to the EPA Central Docket Section, Docket No. A–85–21 (December 3, 1987), JA at 193–94, that memorialized a meeting between EPA staff and representatives of the carriers, the attorney noted that "NTTC also endorses the idea of requiring that a certification of compliance accompany all product from the refinery on down the distribution chain. . . . NTTC noted that . . . there is no requirement that one be provided by a refiner or other shipper (and that it would be difficult for their members to obtain one without such a requirement)."

EPA's response—such as it is—is found in the final rule, 54 Fed.Reg. 11,875 (1989), and in the Public Comments at 76–77, JA at 315–16. The latter statement reads as follows:

> EPA believes that the inclusion of an oversight program as part of the defense is preferable to providing a defense where carriers simply submit documents from the shipper who hired them certifying that the product met RVP standards. Paper certifications alone are not as reliable as test results and do not provide enough assurance that the gasoline does in fact meet the applicable RVP standard. The most effective way to determine whether product is in compliance, and has not been altered after leaving the refiner facility, is to test it.

Thus, we have little doubt that the carriers properly raised the issue in the administrative proceedings, and we have no doubt that EPA's rationale on this point does not meet any standard of reasoned decisionmaking. The agency sets out two possible regulatory paths—oversight-and-testing versus mandatory provision of documentation by shippers to carriers—as though they were mutually exclusive methods. The agency then expresses its choice of the former over the latter. So far so good, but the agency then immediately requires that as part of the chosen methodology, the regulated industry must produce the documentation which would have been the fruit of the methodology it rejected. Nowhere in the administrative file or in the briefs or arguments before this Court has the agency ever offered any rationale for requiring one segment of the industry to produce documentation which can be created only by another segment and then refusing to require that other segment to furnish the regulated entities with the documentation. Nor, for that matter, has it explained its conclusion that the "alternatives" are mutually exclusive. As we note above, we are respectful of and indeed deferential to the reasoned policy choices of an administra-

tive agency. However, in the present case, the agency has offered no reasoning for what appears on its face to be an arbitrary and capricious choice.

We will not, indeed we cannot, dictate to the agency what course it must ultimately take. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Lead Industries Ass'n v. EPA*, 647 F.2d at 1145. For now we simply strike the documentation element from the affirmative defense and permit the presumptively liable carriers to avoid liability by (1) offering evidence of an appropriate periodic sampling program and (2) demonstrating that the carrier did not cause the violation. The EPA may reinstate the documentation element if it meets the carriers' objections with a reasoned explanation. On the other hand, it may wish to impose the solution suggested by the carriers' administrative filings, that is, that the carriers be required to produce to the agency documentation furnished by the refiners-sellers and that the refiners-sellers be required to furnish that documentation to the carriers. It may be possible for the agency to offer a justification to support its present position. It may even be that the EPA will choose some other solution altogether. In any event, that choice is the agency's and not ours.

### III. CONCLUSION

For the reasons stated above, we grant the petition for review insofar as it concerns the documentation element of the affirmative defenses to the volatility regulations. That part of those regulations is arbitrary, capricious and unlawful, and we remand the case to the agency for a reasoned explanation or for amendment consistent with this opinion. The petition is otherwise denied.