# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 13, 2021          Decided July 2, 2021

No. 19-1124

AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

GROWTH ENERGY, ET AL.,
INTERVENORS

———

Consolidated with 19-1159, 19-1160, 19-1162

———

On Petitions for Review of an Order
of the Environmental Protection Agency

———

*Kevin F. King* and *Elizabeth B. Dawson* argued the causes for the Industry Petitioners. With them on the briefs were *Thomas A. Lorenzen*, *Robert J. Meyers*, *Richard S. Moskowitz*, *Robert A. Long, Jr.*, *Thomas R. Brugato*, *Carlton Forbes*, and *John Wagner*.

2

*Jonathan Berry* argued the cause for petitioners Urban Air Initiative, et al. With him on the briefs were *C. Boyden Gray* and *James R. Conde.*

*Suzanne Beaudette Murray* argued the cause for Small Retailers Coalition Petitioners. With her on the briefs was *Michael J. Scanlon.*

*Perry M. Rosen*, Senior Attorney, U.S. Department of Justice, argued the causes for the respondent. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, and *Jonathan D. Brightbill,* Principal Deputy Assistant Attorney General.

*Ethan G. Shenkman* argued the cause for intervenors Growth Energy, et al. in support of respondent. With him on the joint brief were *Matthew W. Morrison*, *Shelby L. Dyl*, *Jonathan S. Martel*, *William C. Perdue*, *Seth P. Waxman*, *Brian M. Boynton*, and *David M. Lehn.*

*Elizabeth B. Dawson* argued the causes for intervenor American Fuel & Petrochemical Manufacturers in support of respondent. With her on the brief were *Thomas A. Lorenzen*, *Robert J. Meyers*, and *Richard S. Moskowitz.*

Before: ROGERS, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In October 2018, the President directed the Environmental Protection Agency "to initiate a rulemaking to consider expanding Reid Vapor Pressure waivers for fuel blends containing gasoline and up to 15 percent ethanol," also known as E15, and to "increase transparency in the Renewable Identification Number (RIN)

market," a feature of the Renewable Fuel Standard ("RFS") program. White House, Fact Sheet: President Donald J. Trump Is Expanding Waivers for E15 and Increasing Transparency in the RIN Market (Oct. 11, 2018) (emphasis omitted). EPA issued a final rule on June 10, 2019, after notice and comment, revising its regulations on fuel volatility and the RIN market. *Modifications to Fuel Regulations To Provide Flexibility for E15; Modifications to RFS RIN Market Regulations*, 84 Fed. Reg. 26,980 (June 10, 2019) (the "E15 Rule"). In Section II, EPA announced a new interpretation of when the limits on fuel volatility under the Clean Air Act could be waived pursuant to 42 U.S.C. § 7545(h)(4), and relatedly reinterpreted the term "substantially similar" in Subsection 7545(f)(1)(A). In these consolidated petitions for review, the petroleum and ethanol industries as well as the Small Retailers Coalition challenge EPA's decision to grant a fuel volatility waiver to E15. For the following reasons, we hold that Section II exceeds EPA's authority under Section 7545 and therefore vacate that portion of the E15 Rule.

## I.

The Clean Air Act establishes, among other things, "a comprehensive scheme for regulating motor vehicle emission and fuel standards for the prevention and control of air pollution." *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1054 (D.C. Cir. 1995). Section 211 of the Act, 42 U.S.C. § 7545, addresses the regulation of fuels.

To safeguard the efficacy of emission control devices in motor vehicles, Subsection 7545(f) restricts the introduction into commerce of new fuels and fuel additives. *See Am. Methyl Corp. v. EPA*, 749 F.2d 826, 829 (D.C. Cir. 1984). It is

unlawful for any manufacturer of any fuel or fuel additive to first introduce into commerce, or to increase the concentration in use of, any fuel or fuel additive for general use in light duty motor vehicles manufactured after model year 1974 which is not *substantially similar* to any fuel or fuel additive utilized in the certification of any model year 1975, or subsequent model year, vehicle or engine under section 7525 of this title.

42 U.S.C. § 7545(f)(1)(A) (emphasis added).  This limitation is subject to waiver, upon application and after notice and opportunity for comment, if "the applicant has established that such fuel or fuel additive . . . will not cause or contribute to a failure of any emission control device or system."  *Id.* § 7545(f)(4).

Subsection 7545(h) limits fuel volatility.  Measured in terms of pounds per square inch ("psi") of Reid Vapor Pressure ("RVP"), volatility reflects how readily gasoline evaporates. Although fuel must be sufficiently combustible to ignite under cold start conditions, gasoline vapors contain volatile organic compounds that are a key ingredient of ground-level ozone. *Nat'l Tank Truck Carriers, Inc. v. EPA*, 907 F.2d 177, 179 (D.C. Cir. 1990).  Thus, "the greater the RVP, the greater the volatility of the gasoline and the larger the amount of ozone formed."  *Id.*  Because ozone is created when volatile organic compounds react with nitrogen oxides in the presence of sunlight, *see S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 887 (D.C. Cir. 2006), controlling fuel volatility is particularly important during the sunnier months of the year when ozone levels are highest, *see Nat'l Tank Truck Carriers*, 907 F.2d at 179.

Subsection 7545(h)(1) directed EPA, not later than six months after enactment of the 1990 Clean Air Act Amendments, to "promulgate regulations making it unlawful for any person during the high ozone season . . . to sell, offer for sale, dispense, supply, offer for supply, transport, or introduce into commerce gasoline with a [RVP] in excess of 9.0 [psi]." 42 U.S.C. § 7545(h)(1). The regulations were to "also establish more stringent [RVP] standards in a nonattainment area." *Id.* EPA regulations limit the RVP of gasoline to 9.0 psi in attainment areas and 7.8 psi in nonattainment areas "during the summer season," which generally runs from May 1 to September 15. 40 C.F.R. § 1090.215(a) (2020); *see id.* § 1090.80 (defining "summer season").

Congress was also aware of various benefits of ethanol as compared to gasoline, however. *See* S. Rep. No. 101-228, at 110 (1989). Because, up to a point, adding ethanol to gasoline increases the fuel's RVP, requiring E10 (fuel with 10% ethanol) to satisfy the 9-psi limit "would likely result in the termination of the availability of ethanol in the marketplace." *Id.* Subsection 7545(h)(4) provides for a waiver:

> For fuel blends containing gasoline and 10 percent denatured anhydrous ethanol, the [RVP] limitation under this subsection shall be one pound per square inch (psi) greater than the applicable [RVP] limitations established under paragraph (1) . . . .

42 U.S.C. § 7545(h)(4). This 1-psi waiver allows qualifying fuels to be sold during the summer months at 10.0 psi in attainment areas and 8.8 psi in nonattainment areas. *See* 40 C.F.R. § 1090.215(b).

Both kinds of waivers — pursuant to Subsections 7545(f)(4) and (h)(4) — underlie the instant dispute. In 1979, E10 was introduced into commerce through a Subsection 7545(f)(4) waiver. *See Fuels and Fuel Additives: Gasohol; Marketability*, 44 Fed. Reg. 20,777 (Apr. 6, 1979). EPA extended the 1979 waiver in 1982 to fuel containing 0–to–10% ethanol upon finding that the "emissions effect of blends containing up to 10 percent anhydrous ethanol in unleaded gasoline would be the same or less than that for the full 10 percent ethanol blend." *Fuels; Blends of Ethanol in Unleaded Gasoline*, 47 Fed. Reg. 14,596, 14,596 (Apr. 5, 1982). Over the next thirty years, use of E10 increased. By 2013, E10 accounted for nearly all gasoline sold in the United States. *E15 Rule*, 84 Fed. Reg. at 26,986.

In 2010 and 2011, EPA determined that E15 would not impair certain motor vehicles' emission controls under Subsection 7545(f)(4) and by waivers approved the use of E15 in light-duty motor vehicles made after 2000. *See Partial Grant of Clean Air Act Waiver Application Submitted by Growth Energy To Increase the Allowable Ethanol Content of Gasoline to 15 Percent*, 76 Fed. Reg. 4,662 (Jan. 26, 2011); *Partial Grant and Partial Denial of Clean Air Act Waiver Application Submitted by Growth Energy To Increase the Allowable Ethanol Content of Gasoline to 15 Percent*, 75 Fed. Reg. 68,094 (Nov. 4, 2010); *see also Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 173 (D.C. Cir. 2012). These waivers did not include the 1-psi waiver that enabled the summer sale of E10, but instead required E15 to meet the generally applicable 9-psi limit. EPA rejected requests to apply the 1-psi waiver to E15, interpreting Subsection 7545(h)(4) as "limit[ed] . . . to fuel blends containing gasoline and 9–10 vol% ethanol." *Regulation To Mitigate the Misfueling of Vehicles and Engines With Gasoline Containing Greater Than Ten Volume Percent Ethanol and Modifications to the Reformulated and*

*Conventional Gasoline Programs*, 76 Fed. Reg. 44,406, 44,433 (July 25, 2011) ("Misfueling Rule"). Because it is cost-prohibitive to produce ethanol blends with volatility not exceeding 9.0 psi, EPA's waiver condition prevented the sale of E15 during the summer. *See E15 Rule*, 84 Fed. Reg. at 26,990, 26,993.

In October 2018, the President directed EPA to initiate a rulemaking to consider modifying the volatility limits for E15 so it could "be sold year round rather than just eight months of the year." White House, Fact Sheet: President Donald J. Trump Is Expanding Waivers for E15 and Increasing Transparency in the RIN Market (Oct. 11, 2018). Section II of the E15 Rule, which EPA issued in June 2019, extended the 1-psi waiver to fuel blends with an ethanol concentration of "at least 9% and no more than 15% (by volume) of the gasoline." *E15 Rule*, 84 Fed. Reg. at 27,021 (codified at 40 C.F.R. § 80.27(d)(2), now codified in § 1090.215(b)). This change rested on two subsidiary determinations. First, EPA "adopt[ed] a new interpretation" of Subsection 7545(h)(4), *id.* at 26,991, as simply "establishing a lower limit, or floor, on the minimum ethanol content for a 1-psi waiver," *id.* at 26,992. Under its revised interpretation, the "lack[] [of] modifiers for the term 'containing'" in Subsection 7545(h)(4), "in contrast to the other statutory provisions" in Section 7545, renders the term "ambiguous and provides room for . . . interpretive and policy choices." *Id.* EPA concluded it was "permissible . . . to interpret 'containing' to mean 'containing at least'" such that "all fuels which contain at least 10 percent ethanol may receive the 1-psi waiver, including blends that contain more than 10 percent ethanol." *Id.* This new interpretation, EPA noted, advanced the statutory purpose of promoting the use of ethanol fuel. *Id.* at 26,993. Second, EPA determined that E15 is "substantially similar" to E10, a fuel used to certify vehicle emissions control systems, when used in light-duty motor

vehicles made after 2000. Because E15 thereby satisfied the requirements of Subsection 7545(f)(1)(A), as well as Subsection 7545(h)(4) as EPA reinterpreted it, E15 could be sold at 10.0 psi notwithstanding the volatility conditions in the 2010–2011 waivers. *Id.*

Three sets of petitioners challenge Section II of the E15 Rule. Petroleum Petitioners contend that Subsection 7545(h)(4)'s 1-psi waiver does not apply to blends with more than 10% ethanol and that EPA's reinterpretation contradicts the statutory text, context, and history. They further contend that EPA lacks authority to make a partial substantial-similarity determination pursuant to Subsection 7545(f)(1)(A), and that its finding that E15 is substantially similar to E10 is arbitrary and capricious. Ethanol Petitioners also challenge EPA's reinterpretation of Subsection 7545(f)(1)(A), but they maintain that the E15 Rule does not go far enough. They assert that fuel blends with more than 15% ethanol are substantially similar to E10, obligating EPA to extend the 1-psi waiver to those higher-ethanol blends. The Small Retailers Coalition challenge is directed to EPA's certification that the E15 Rule will not adversely affect small businesses. The Coalition argues that certification was inconsistent with the Regulatory Flexibility Act and irrational because small fuel retailers will be required to undertake costly infrastructure upgrades to store and sell E15.

## II.

As a threshold matter, the court addresses whether at least one of the petitioners has standing under Article III of the Constitution to obtain review of the E15 Rule. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998); *Carbon Sequestration Council v. EPA*, 787 F.3d 1129, 1137 (D.C. Cir. 2015). If one of the Petroleum Petitioners has

standing, and if their contention that the E15 Rule is contrary to the plain text, context, and history of the Clean Air Act is persuasive, then, absent the severability of Section II, the court must vacate the E15 Rule.

Article III standing requires that a petitioner show an "injury in fact," a "causal connection" between the injury and the challenged conduct, and a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). The party invoking the court's jurisdiction bears the burden of demonstrating a "substantial probability" of standing. *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (quoting *Am. Petro. Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000)). When standing is not self-evident — for example, as may be true if a petitioner is not directly regulated by the challenged rule — "the petitioner must supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review." *Id.* at 900. An association may bring suit on behalf of its members "only if (1) at least one of its members would have standing to sue in [its] own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 318 (D.C. Cir. 2020) (quoting *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013)).

One of the Petroleum Petitioners, American Fuel & Petrochemical Manufacturers ("AFPM"), a trade association that "represents most refiners in the United States," Susan W. Grissom Decl. ¶ 2, has standing. Two of its members, Motiva Enterprises LLC and Sinclair Oil Corporation, could each assert a justiciable claim in its own right. Motiva and Sinclair assert injuries under the doctrine of competitor standing, which

recognizes that "economic actors 'suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition.'" *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1015 (D.C. Cir. 2016) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). To demonstrate competitor injury, a petitioner must "show an actual or imminent increase in competition." *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010). With injury established, the rest of the standing inquiry ordinarily falls into place: the increased competition is caused by the agency's action and redressed by restoring the regulatory *status quo ante*. *See Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 341–42 (D.C. Cir. 2018); *Nat'l Biodiesel Bd.*, 843 F.3d at 1015.

Motiva and Sinclair produce petroleum products. William Spurgeon Decl. ¶ 4; Adam G. Suess Decl. ¶ 1. They compete with biofuel producers in the motor vehicle fuel market because ethanol is a substitute for the traditional petroleum-based components of gasoline. Spurgeon Decl. ¶ 25. By removing the otherwise applicable 9-psi volatility limit, the E15 Rule is substantially likely to increase demand for E15. Suess Decl. ¶¶ 10–11; *see Nat'l Biodiesel Bd.*, 843 F.3d at 1015–16; *Delta Const. Co. v. EPA*, 783 F.3d 1291, 1299–1300 (D.C. Cir. 2015). EPA, upon extrapolating from monthly E15 retail sales data collected in Minnesota between 2015 and 2018, has estimated that "annual per-station sales of E15 would have been about 16% higher had the 1psi waiver been available for E15." Resp. to Comments at 97. Increased production of E15 is, in turn, likely to cause a significant rise in demand for ethanol and a significant reduction in demand for petroleum. Spurgeon Decl. ¶ 25; Suess Decl. ¶¶ 12–13. Because vacatur of the E15 Rule would redress these injuries, Motiva and Sinclair have competitor standing. *See Nat'l Biodiesel Bd.*, 843 F.3d at 1015.

The other two elements of associational standing are also satisfied. The interests that AFPM seeks to protect are germane to its purpose; it has an "obvious interest in challenging" a rule detrimental to the financial wellbeing of its members. *Am. Trucking Ass'ns*, 724 F.3d at 247. Neither the claims asserted regarding EPA's statutory violations, nor the relief sought by vacatur requires the participation of AFPM's members. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015). Because AFPM has shown a substantial probability of associational standing, the court need not consider other bases offered by Petroleum Petitioners to establish Article III standing. *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017).

## III.

Turning to the merits, Petroleum Petitioners contend that the E15 Rule is contrary to the plain meaning of Subsection 7545(h)(4). They maintain that the statute is clear on its face: the phrase "fuel blends containing gasoline and 10 percent . . . ethanol" refers to E10 and E10 only. It follows, they conclude, that Subsection 7545(h)(4) does not authorize EPA to alter the volatility limits for E15. EPA responds that the term "containing" is sufficiently ambiguous to render its revised interpretation reasonable and deserving of deference by the court. Intervenors Growth Energy, National Corn Growers Association, and Renewable Fuels Association ("Biofuel Intervenors") agree with Petroleum Petitioners that the statute is unambiguous, but they contend that Subsection 7545(h)(4) unambiguously applies to all fuel blends with at least 10% ethanol.

The court's review of EPA's interpretation of the Clean Air Act proceeds under the two-step framework announced in

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, *Inc.*, 467 U.S. 837 (1984). *See Michigan v. EPA*, 576 U.S. 743, 751 (2015); *Am. Fuel & Petro. Mfrs. v. EPA*, 937 F.3d 559, 574 (D.C. Cir. 2019). The court first asks "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. In answering that question, the court exhausts the "traditional tools of statutory construction," considering the provision's text, context, legislative history, and purpose. *Id.* at 843 n.9; *see U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 605 (D.C. Cir. 2016). When Congress has written clearly, "that is the end of the matter," because the court and EPA "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. When "the statute is silent or ambiguous with respect to the specific issue," then the court will uphold EPA's interpretation so long as it "is based on a permissible construction of the statute." *Id*. at 843.

Our interpretation of Subsection 7545(h)(4) "begin[s] with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). The statutory directive is straightforward. Subsection 7545(h)(4) authorizes EPA to grant a 1-psi waiver to a particular type of fuel: "blends containing gasoline and 10 percent denatured anhydrous ethanol." 42 U.S.C. § 7545(h)(4). In other words, Subsection 7545(h)(4) refers to E10. This understanding accords with the ordinary meaning of the word "contain" used as a percentage. Consider a label that a bottle of wine "contains 10% alcohol by volume." No one would understand that number to be other than a literal statement of the actual amount of alcohol in a serving. By contrast, the label would be misleading if the wine contained only 5% alcohol or 15% alcohol. Here the ordinary meaning of the phrase

"containing gasoline and 10 percent . . . ethanol" specifies the relative amount of ethanol in a unit of fuel, not the minimum or maximum ends of an unspecified range. Confirming the ordinary meaning of "containing," the inclusion of the adjectives "denatured" (ethyl alcohol, that is, undrinkable alcohol) and "anhydrous" (alcohol that has had water removed to a purity of 99% ethanol), Resp't's Br. 17 n.6, reads like a scientific formula. A chemist or petroleum engineer would not read instructions directing the preparation of a solution containing "10 percent denatured anhydrous ethanol" to require the addition of anything other than 10 percent denatured anhydrous ethanol, and no more.

This understanding of "containing" comports with contemporaneous dictionary definitions. When Subsection 7545(h)(4) was enacted in 1990, the word "contain" was defined, as relevant, as "to have within," "to hold," or "to comprise" in a manner that "implies the actual presence of a specific substance or quantity within something." WEBSTER'S NEW COLLEGIATE DICTIONARY 282 (9th ed. 1990); *see also* 3 THE OXFORD ENGLISH DICTIONARY 807 (2d ed. 1989). Applying those definitions, Subsection 7545(h)(4) is best read to concern gasoline that "has within it" or "holds" a specific quantity (10%) of a specific substance (ethanol). By its plain terms, then, Subsection 7545(h)(4) applies to E10, leaving no room for EPA to exempt E15 from the 9-psi volatility limit prescribed in Subsection 7545(h)(1).

Statutory context reinforces the conclusion that Congress intended Subsection 7545(h)(4) to regulate E10. Numerous provisions of the Clean Air Act enacted contemporaneously with Subsection 7545(h) in the 1990 Amendments, Pub. L. No. 101-549, 104 Stat. 2399, have percentages with modifiers. Sometimes the modifier establishes a minimum allowable amount. For example, EPA is directed to promulgate

regulations requiring certain urban buses to use "low-polluting fuels," 42 U.S.C. § 7554(c)(2)(A), including methanol, which is defined as a blend containing "*at least* 85 percent methanol," *id.* § 7554(f)(2) (emphasis added). The 1990 Amendments also require that gasoline "contain *not less* than 2.7 percent oxygen" by weight during the winter months in areas that do not meet the national ambient air quality standards for carbon monoxide. *Id.* § 7545(m)(2) (emphasis added). Other times the modifier imposes an upper limit. Addressing misfueling, Congress prohibited any person from knowingly introducing into commerce diesel fuel that "contains a concentration of sulfur *in excess of* 0.05 percent (by weight)." *Id.* § 7545(g)(2) (emphasis added). And in Subsection 7545(h)(1), Congress instructed EPA to "promulgate regulations making it unlawful for any person during the high ozone season" to "introduce into commerce gasoline with a Reid Vapor Pressure *in excess of* 9.0 pounds per square inch." *Id.* § 7545(h)(1) (emphasis added).

In contrast, Congress did not include any modifiers in Subsection 7545(h)(4). Section 7545 itself illustrates that Congress knew how to use modifiers to set upper and lower limits. The absence of such a term in Subsection 7545(h)(4) may properly be understood as purposeful. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002); *New York v. EPA*, 413 F.3d 3, 39–40 (D.C. Cir. 2005). Had Congress intended to exempt a range of ethanol fuels from the 9-psi limit, it could have referred to fuel containing "at least" or "not more than" 10% ethanol, much as appeared in the House version of the 1-psi waiver. *See* H.R. 3030, 101st Cong. § 214 (1989). The reference to E10 without modifiers suggests that Congress intended Subsection 7545(h)(4) to apply to E10.

The statutory history points in the same direction. EPA had regulated fuel volatility before Subsection 7545(h)(4) was enacted. In particular, the year before the 1990 Amendments

were enacted, EPA had imposed seasonal, state-specific volatility limits on gasoline and granted ethanol fuels a 1-psi waiver, provided the fuel "contain at least 9% ethanol" and its "maximum ethanol content . . . not exceed any applicable waiver conditions" granted pursuant to Subsection 7545(f)(4). *Volatility Regulations for Gasoline and Alcohol Blends Sold in Calendar Years 1989 and Beyond*, 54 Fed. Reg. 11,868, 11,885 (Mar. 22, 1989). Because only E10 had received a waiver at that time, EPA's exemption effectively applied only to fuels containing between 9 and 10 percent ethanol. *See E15 Rule*, 84 Fed. Reg. at 26,988. The following year, when Congress enacted Subsection 7545(h), it retained EPA's general framework for regulating fuel volatility, including granting ethanol fuels a 1-psi allowance. But Congress rejected EPA's open-ended approach to the 1-psi waiver, declining to codify the "at least" modifier and flexible upper limit in EPA's 1989 Rule, instead limiting Subsection 7545(h)(4) to E10.

Other legislative actions by Congress around the same time that it enacted the 1990 Amendments are to the same effect. Ten days before enacting the 1990 Amendments, Congress raised the tax imposed on motor vehicle fuels as part of the High Way Trust Fund. Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11211(a)(2), 104 Stat. 1388–423 (1990). A lower tax was imposed on "any mixture *at least* 10 percent of which is alcohol . . . if any portion of such alcohol is ethanol." *Id.* § 11211(a)(5)(F), 104 Stat. 1388–424 (emphasis added). This legislation further underscores that Congress' omission of a modifier in Subsection 7545(h)(4) was deliberate.

Indeed, EPA itself has previously credited Subsection 7545(h)'s legislative history as evidence that it lacked authority to extend the 1-psi waiver to fuels other than E10. In 1991, when implementing Subsection 7545(h)(4), EPA stated that

"the legislative history indicates that Congress envisioned continuation of the 9 to 10 percent requirement" set forth in EPA's 1989 Rule. *Regulation of Fuels and Fuel Additives: Standards for Gasoline Volatility; and Control of Air Pollution from New Motor Vehicles and New Motor Vehicle Engines: Standards for Particulate Emissions from Urban Buses*, 56 Fed. Reg. 24,242, 24,245 (May 29, 1991). And in adopting regulations in 2011 to prevent misfueling, EPA pointed to Subsection 7545(h)(4)'s "legislative history [as] support[ing] EPA's interpretation . . . that the 1 psi waiver only applies to gasoline blends containing 9–10 vol% ethanol." *Misfueling Rule*, 76 Fed. Reg. at 44,434.

The defenses of EPA's new interpretation of Subsection 7545(h)(4) in the E15 Rule are unpersuasive. EPA and Biofuel Intervenors maintain that the statute is ambiguous inasmuch as no party challenges EPA's longstanding view that the phrase "containing . . . 10 percent," in Subsection 7545(h)(4) "includes [blends with] as little as 9 percent" ethanol. *E15 Rule*, 84 Fed. Reg. at 26,992 n.90. But recognizing some compliance margin associated with Subsection 7545(h)(4)'s "10 percent" does not support interpreting this provision as though it applied to blends containing "at least 10 percent" ethanol. *See City of Arlington v. FCC*, 569 U.S. 290, 307 (2013). EPA and Biofuel Intervenors also maintain that Subsection 7545(h)(4) can be read as specifying the minimum ethanol content eligible for the 1-psi waiver because the word "containing" is frequently understood to implicitly mean "containing at least." Resp't's Br. 40; Biofuel Intervenors' Br. 17–18. As an example, EPA states that a physician's diagnosis that a "patient's blood must 'contain 10% white blood cells'" to repel infections "clearly does not mean exactly 10.0% white blood cells" but rather "*at least* 10% white blood cells." Resp't's Br. 40. Yet the problem with this argument is that "the sort of ambiguity giving rise to *Chevron* deference is a creature

not of definitional possibilities, but of statutory context." *New York v. EPA*, 443 F.3d 880, 884 (D.C. Cir. 2006) (internal quotation marks omitted) (quoting *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 469 (D.C. Cir. 2005)). Examples from other settings are unlikely to undermine contextual evidence of textual meaning in a complex regulatory regime designed to reduce air pollution where the unmodified term "containing" is used with a percentage.

As to legislative history, EPA and Biofuel Intervenors point out that Congress considered but ultimately rejected the House version of Subsection 7545(h)(4), which provided that "the Administrator may permit gasoline containing *at least* 9 but *not more than* 10 per centum ethanol (by volume) to exceed the applicable Reid vapor pressure requirements by up to 1.0 psi." H.R. 3030, 101st Cong. § 214 (as introduced, July 27, 1989) (emphasis added). They maintain that Congress' decision not to adopt the House's modifier of "not more than" demonstrates there was no intention to limit the 1-psi waiver to E10. *See* Resp't's Br. 35–37; Biofuel Intervenors' Br. 22–23. This account of the legislative history is meaningfully incomplete. Congress was faced with at least three competing versions of the fuel volatility waiver. The bill introduced in the House limited the 1-psi waiver to fuel containing "not more than" 10% ethanol. H.R. 3030, § 214. The House bill reported out of Committee used different phrasing, stating that "the Administrator shall permit a 1.0 pound per square inch (psi) tolerance level for gasoline containing *at least* 10 percent ethanol." H.R. 3030, 101st Cong. § 216 (as reported by H. Comm. on Public Works and Transp., May 21, 1990) (emphasis added). Congress adopted neither of those versions, instead adopting the Senate's phrasing nearly exactly as introduced, which provided that only "fuel blends containing gasoline and 10 per centum denatured anhydrous ethanol" would receive the 1-psi waiver. S. 1360, 101st Cong. § 214 (as

introduced, Sept. 14, 1989); *see also* Pub. L. No. 101-549, § 216, 104 Stat. 2399, 2490. The legislative history is silent on why Congress rejected each House formulation and instead adopted the Senate version. This ambiguous history hardly suffices to overcome the plain text, for courts "do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994).

Lastly, EPA and Biofuel Intervenors maintain that confining Subsection 7545(h)(4) to E10 is contrary to its "ethanol-promoting purpose." Biofuel Intervenors' Br. 22; *see* Resp't's Br. 41. Perhaps so, in one respect. Yet Subsection 7545(h) need not be understood to serve one purpose at all costs. *See Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012); *cf. Ams. for Clean Energy v. EPA*, 864 F.3d 691, 714 (D.C. Cir. 2017). A Senate Committee Report on the 1990 Amendments highlights that Congress was balancing multiple interests. As EPA and Biofuel Intervenors maintain, scientific evidence available to Congress at the time of Subsection 7545(h)'s enactment shows that increasing the ethanol content in a fuel blend beyond 10% reduces the blend's volatility. *See, e.g.*, Robert L. Furey, *Volatility Characteristics of Gasoline-Alcohol and Gasoline-Ether Fuel Blends* 23 (1985). But the record also reflects congressional attention to wide-ranging economic, energy-security, and geopolitical implications of authorizing such blends. *See* S. Rep. No. 101-228, at 110 (1989). In limiting the 1-psi allowance to blends "containing 10 percent ethanol," Congress balanced those interests. Subsection 7545(h)(4) thus reflects a compromise, not simply a desire to maximize ethanol production at all costs.

Because the text, structure, and legislative history of Subsection 7545(h)(4) foreclose EPA's application of the 1-psi waiver to E15, the court must determine whether that aspect of the E15 Rule is severable. Severability "depends on the issuing

agency's intent," *North Carolina v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984), and severance "is improper if there is substantial doubt that the agency would have adopted the severed portion on its own," *New Jersey v. EPA*, 517 F.3d 574, 584 (D.C. Cir. 2008) (internal quotation marks omitted) (quoting *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997)).   The court need not reach the petitioners' challenges to the E15 Rule's interpretation of Subsection 7545(f)(1).   EPA stated in the preamble that its "substantial-similarity" finding and interpretation of Subsection 7545(h)(4) in Section II "establish a single, unified program that allows the introduction into commerce of E15 at 10.0 psi RVP during the summer driving season," and that it "d[id] not intend for any of these individual actions to be severable." *E15 Rule*, 84 Fed. Reg. at 26,983.   In contrast, EPA stated that Section II was "severable from" Section III, addressing the RIN market, "as these are two separate actions, each of which operates independently from the other." *Id.*

Accordingly, the court will sever and vacate Section II of the E15 Rule and dismiss the remaining petitions as moot.